UNITED STATES of America,
Plaintiff-Appellee,
v.
Robert CRAIG and Louis A. Markert,
Defendants-Appellants.
No. 77–1364.

United States Court of Appeals,
Seventh Circuit.

Argued Nov. 4, 1977.
Decided March 22, 1978.

Anna R. Lavin, Chicago, Ill., for defendants-appellants.

Thomas P. Sullivan, U. S. Atty., James F. Holderman, Asst. U. S. Atty., Chicago, Ill., for plaintiff-appellee.

Before CUMMINGS and PELL, Circuit Judges, and CAMPBELL, Senior District Judge.[*]

WILLIAM J. CAMPBELL, Senior District Judge.

Among the members of the House of Representatives of the Seventy-seventh Illinois General Assembly were the defendants-appellants herein, Robert Craig and Louis A. Markert, both of whom were found guilty by a jury of conspiring to commit extortion under color of official right in violation of the Hobbs Act, 18 U.S.C. § 1951, and of mail fraud in violation of 18 U.S.C. § 1341. The events giving rise to the prosecution of these charges occurred during the Spring and Fall 1971 Session of the Illinois General Assembly, and concern the defendants' exacting $1,500 from a rental vehicle trade association known as the Illinois Car and Truck Renting and Leasing Association (CATRALA) by means of a "fetcher" bill.[1] We affirm.

The evidence showed that defendant Thomas J. Hanahan[2] introduced a bill entitled House Bill 2025 which was designed to amend the Illinois Vehicle Code. The amendment would require that the title certificate of a rental car carry an indication that the vehicle had been a rental vehicle. A title certificate so identified would result in reducing the resale price of a rental vehicle by five or six hundred dollars.

Shortly after introducing House Bill 2025, Hanahan and Craig met with Pete Pappas, an unindicted co-conspirator/co-schemer, who was chairman of the Motor Vehicle Committee of the House of Representatives. House Bill 2025 was to be assigned to Pappas' committee. It was agreed that the money generated by House Bill 2025 would be evenly divided, and that Pappas would not hold any committee hearings on the bill until Hanahan had time to negotiate with the CATRALA people.

On the last day of the Spring 1971 Session Doris Steigberg, the executive secretary and registered lobbyist of CATRALA, asked Craig about the status of House Bill 2025. Craig responded that he thought the bill could be stopped for $5,000. After Steigberg indicated that her people were having a difficult enough time paying her salary, and that she didn't know how she could raise that amount of money, Craig instructed her to "take it back to [her] people and see what they can do." Steigberg immediately telephoned Frank LoNano, the President of CATRALA, at his Schiller Park, Illinois, office, and told him that she had been approached for money on House Bill 2025. A short time later Steigberg explained to a CATRALA board meeting the potential damage to the rental car industry posed by House Bill 2025, and further stated that she had been approached by a person in Springfield for money.

House Bill 2025 was scheduled for a committee hearing on October 22, 1971. A few days prior thereto Steigberg told Craig that her people indicated that the $5,000 figure was absolutely too much. In response to Steigberg's inquiry as to the least amount that would be acceptable, Craig urged her to "try for $2,000." Steigberg then spoke with LoNano. On the day of the hearing Markert asked Steigberg if she had heard anything. Steigberg told Markert that $2,000 was too much money, and asked if he could "try for fifteen hundred." Shortly thereafter Markert told Steigberg that although they were unhappy about it, $1,500

---

[*] Senior United States District Judge William J. Campbell of the Northern District of Illinois is sitting by designation.

1. The record reflects that a "fetcher bill" is a bill introduced by legislators for purposes of exacting money from an industry.

2. Hanahan was also named a defendant in the indictment. He was found not guilty on both counts.

would be acceptable.[3] Steigberg informed LoNano of the agreed amount. The hearing on House Bill 2025 was postponed.

On November 12, 1971, Steigberg telephoned Lee Workman, the Assistant Vice President, Chicago Zone Manager for Hertz Corporation (Hertz), whose office was located in Des Plaines, Illinois. Hertz was a member of CATRALA, and Workman was a member of the CATRALA Board of Directors. Steigberg told Workman that time was running out regarding House Bill 2025, that the financial burden of $5,000 would fall on the four largest rental car operators, and that Hertz's share was $1,500.

Workman prepared a check drawn on Hertz's petty cash account at a Chicago bank. The check for $1,500 was made payable to Steigberg, and its stub carried the notation that it was drawn for a CATRALA assessment regarding Illinois title law. The check was sent by special delivery mail from the Hertz office in Des Plaines to Steigberg in Springfield.

Steigberg received the check on November 14, 1971. A cover letter from Workman accompanied the check. Steigberg destroyed the cover letter, and telephoned Workman insisting that he also destroy his copy of the letter.[4] After cashing the check at a hotel in Springfield, Steigberg placed the money in an envelope. On the outside of the envelope she wrote "Robert Craig, personal."

Steigberg took the envelope to Craig's office in the State Capitol, but found that Craig had departed for home. Craig's secretary, Sherron Ackley, indicated that she would be flying to Craig's home with some other materials and would take the envelope for Craig with her. Steigberg left the envelope with Ackley.

Some time later Pappas telephoned Craig and asked if they had received the money from the rental car bill. Craig answered affirmatively, and said he'd mail Pappas his share. Two or three days later, Pappas received $600 in cash in the mail.

House Bill 2025 was tabled during the following Spring Session of the General Assembly.

This prosecution has resulted in two previous decisions by this court. *United States v. Craig*, 528 F.2d 773 (7th Cir. 1976) (*Craig I*), and the *en banc* decision on rehearing reported at 537 F.2d 957 (7th Cir. 1976), *cert. denied sub nom. Markert v. United States*, 425 U.S. 973, 96 S.Ct. 2171, 48 L.Ed.2d 796 (1976) (*Craig II*), dealt with an asserted testimonial privilege of a state legislator in the context of a federal criminal prosecution. In this appeal defendants contend that *Craig II* should be reexamined, and that the district court's refusal to dismiss the indictment on the ground that Congress did not intend the federal criminal statutes involved in this case to be applicable to state legislators should be reversed.

We recently rejected an identical contention in *United States v. Craig*, 573 F.2d 455, pp. 489–491 (7th Cir. 1977), a case involving the same appellant Craig as this case, but based on a different prosecution. We also reject the contention here. See also: *In Re Grand Jury Proceedings*, 563 F.2d 577, 582 (3rd Cir. 1977).

With respect to both counts of the indictment, defendants contend that there is insufficient proof. As to Count One, charging a violation of the Hobbs Act, (18 U.S.C. § 1951),[5] defendants' attack is three-

---

**3.** About two weeks later Markert made further inquiry about the money. Steigberg stated that $1,500 had been agreed upon and would be paid.

**4.** Workman had his copy of the cover letter destroyed. To the best of his recollection the letter stated that a check for $1,500 was enclosed for purposes of blocking the Illinois title law.

**5.** In relevant part, 18 U.S.C. § 1951 provides:

"(a) Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires so to do, or commits or threatens physical violence to any person or property in furtherance of a plan or purpose to do anything in violation of this section shall be fined not more than $10,000 or imprisoned not more than twenty years, or both.

pronged. First, noting that they were charged with conspiracy to obtain money unlawfully from companies belonging to CATRALA, defendants argue that under general conspiracy principles there was no evidence upon which to rest jurisdiction to conduct a trial on the charges in the Northern District of Illinois.

■ Conspiracy is a substantive federal criminal offense. 18 U.S.C. § 371. Generally, proper venue for a prosecution of the substantive crime of conspiracy lies in the district where the agreement was entered into, *Hyde v. Shine*, 199 U.S. 62, 25 S.Ct. 760, 50 L.Ed. 90 (1905), or at the place where an overt act to effect the object of one of the conspirators was performed. *Hyde v. United States*, 225 U.S. 347, 32 S.Ct. 793, 56 L.Ed. 1114 (1912). Pointing out that the evidence in this case showed neither an agreement among the defendants in the Northern District of Illinois, nor an overt act in furtherance of the conspiracy in that district, defendants argue that prosecution of a Hobbs Act conspiracy offense in the Northern District of Illinois was based on improper venue. We do not agree.

Federal district courts have exclusive jurisdiction of all offenses against the United States. 18 U.S.C. § 3231. Venue for the prosecution of federal offenses is established by Rule 18, F.R.Crim.P. in the district in which such offense is committed. Rule 18 thus reflects Article III, Section 2, Paragraph 3, of the Constitution, which mandates that criminal trials be "held in the State where the said Crimes shall have been committed." The Sixth Amendment similarly guarantees a criminal defendant "the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed."

■ Venue for a Hobbs Act prosecution properly lies in any district where commerce is affected. *United States v. Floyd*, 228 F.2d 913, 918 (7th Cir.), *cert. denied*, 351 U.S. 938, 76 S.Ct. 835, 100 L.Ed. 1466 (1956). See also: 18 U.S.C. § 3237. In this case the evidence showed that the federal offense of extortion occurred in the Northern District of Illinois because defendants' misdeeds affected commerce [6] in that district. The extorted money was shown to have come from the Hertz Corporation's petty cash fund in Chicago, in the Northern District of Illinois. Hertz Corporation was shown to be a company engaged in interstate commerce within the meaning of 18 U.S.C. § 1951(b)(3). Because the extortion affected commerce in Chicago, the District Court for the Northern District of Illinois was empowered to entertain that charge, regardless of the fact that defendants may have been prosecuted in another district under venue principles pertaining to conspiracy.

■ Defendants secondly argue that there was a failure of proof in that Hertz Corporation was shown to be the victim of the extortion, but that Hertz was not named as a victim in the indictment. We understand this contention to mean that there was a fatal variance between the Hobbs Act charge of the indictment and the proof of that charge adduced at trial. We find no such fatal variance.

The indictment charged the defendants with extorting $1,500 from "the registered lobbyist, officers, members of and companies belonging to the Illinois Car and Truck Renting and Leasing Association." The evidence adduced at trial demonstrated precisely what was charged: that defendants extorted $1,500 from the Hertz Corporation, which was shown to be a member of CATRALA. No claim is made that the proof took the defendants by surprise, or that the proof was so variant with the charge that defendants could not adequately prepare a

"(b) As used in this section—

(2) The term "extortion" means the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right."

**6.** Extortion becomes a federal offense in violation of the Hobbs Act where it interferes with interstate commerce "in any way or degree." 18 U.S.C. § 1951(a). *Stirone v. United States*, 361 U.S. 212, 215, 80 S.Ct. 270, 4 L.Ed.2d 252 (1960).

defense or assert a finding on the charges as a bar to a subsequent prosecution. See *United States v. Warden*, 545 F.2d 32, 35 (7th Cir. 1976); *United States v. Cassell*, 452 F.2d 533, 536 (7th Cir. 1971).

■ As the third prong of their attack, defendants argue that the evidence failed to demonstrate that their extortionate conduct had an affect on interstate commerce, which is an essential element of a Hobbs Act prosecution. *Stirone v. United States*, 361 U.S. 212, 80 S.Ct. 270, 4 L.Ed.2d 252 (1960). There must be a nexus between the extortionate conduct and interstate commerce in order to establish federal jurisdiction. *United States v. Elders*, 569 F.2d 1020, 1024 (7th Cir.). (Slip opinion, No. 77–1181, February 1, 1978, p. 5). The nexus may be a *de minimis* depletion of financial resources of a company engaged in interstate commerce. *United States v. DeMet*, 486 F.2d 816, 822 (7th Cir. 1973), *cert. denied*, 416 U.S. 969, 94 S.Ct. 1991, 40 L.Ed.2d 558 (1974).

■ It was stipulated at trial that the Hertz Corporation was engaged in commerce as defined in the Hobbs Act. The evidence showed that the company's assets were depleted, albeit in a *de minimis* fashion, by the defendants' extortionate demands. We find sufficient evidence demonstrating an affect on interstate commerce which can be characterized as at least "arguably *de minimis*." *United States v. Crowley*, 504 F.2d 992, 997 (7th Cir. 1974).

■ Count Two of the indictment charged the defendants with a violation of the mail fraud statute, 18 U.S.C. § 1341.[7] Defendants urge that their convictions on Count Two must be reversed because they did not cause the use of the mails, and there was no evidence adduced at trial to indicate that the use of the mails was foreseeable. Defendants point out that they were told that the extorted money would come from Steigberg's salary, and that there was no basis for foreseeing that Steigberg would deal in a fraudulent manner with Hertz in order to procure the $1,500.

The mail fraud statute forbids the use of or causing the use of the mails in connection with the execution of a scheme to defraud. The Supreme Court dealt with the question of causing the use of the mails in the following way:

"Where one does an act with knowledge that the use of the mails will follow in the ordinary course of business, or where such use can reasonably be foreseen, even though not actually intended, then he 'causes' the mails to be used. *United States v. Kenofskey*, 243 U.S. 440, 37 S.Ct. 438, 61 L.Ed. 836."

*Pereira v. United States*, 347 U.S. 1, 8–9, 74 S.Ct. 358, 363, 98 L.Ed. 435 (1954). See also: *United States v. Craig, supra*, pp. 481–485. The evidence in this case shows that defendants caused a reasonably foreseeable use of the mails.

The record shows that both Craig and Markert had conversations with Steigberg in which they refer to the CATRALA companies and personnel as "her [Steigberg's] people," thus reflecting defendants' understanding of Steigberg's role as an intermediary between defendants and CATRALA. During negotiations concerning the amount of extortion money, Craig instructed Steigberg to communicate the extortion demand

---

**7.** 18 U.S.C. § 1341 provides:

"Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, or to sell, dispose of, loan, exchange, alter, give away, distribute, supply, or furnish or procure for unlawful use any counterfeit or spurious coin, obligation, security, or other article, or anything represented to be or intimated or held out to be such counterfeit or spurious article, for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, or takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by mail according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter or thing, shall be fined not more than $1,000 or imprisoned not more than five years, or both."

to her people to "see what they can do." After the $1,500 figure was agreed upon, Markert inquired of Steigberg if "[she] had heard and if the money was there."

In our view the record demonstrates that defendants were aware that the source of the extorted money was someone other than Steigberg. As such, it was certainly foreseeable that the money would have to be delivered by some means, and, further, it was foreseeable that the mails would be used to effectuate the delivery. Procuring the money from CATRALA was an essential part of the fraudulent scheme, and because the use of the mails for purposes of delivering the demanded money was reasonably foreseeable, defendants are accountable for that use of the mails under the mail fraud statute even though they did not personally use or intend to use the mail to further the scheme. *Pereira v. United States, supra, United States v. Craig, supra,* 573 F.2d 455.

■ Doris Steigberg testified at trial under a grant of immunity. On direct examination the prosecutor inquired of her understanding of the terms of the arrangement:

"Q. What is your understanding of the terms of that immunity? ·

"A. That my testimony or evidence that I give will not be held against me as long as I tell the truth."

Defendants assert that it is common practice for a prosecutor to have an immunized witness emphasize that his testimony is being used so long as the witness convinces the prosecutor that he is truthful. Defendants further argue that questions and answers concerning the immunized witness' understanding of the terms of immunization convey to the jury the impression that the prosecutor is in a position to personally know whether or not a witness is truthful, and that consequently the jury is given the appearance of a witness whose veracity is vouched for by the government.

We find nothing improper about the question of the witness' understanding of the terms of the immunity order in this case. There was no insinuation by the prosecutor, direct or otherwise, that the government possessed knowledge to the exclusion of the jury on the issue of the immunized witness' veracity. Cf. *United States v. Creamer,* 555 F.2d 612 (7th Cir. 1977). Further, we believe that the jury's function of assessing credibility and weighing testimony is aided by evidence of an immunized witness' understanding of the terms under which he or she is testifying. Indeed, such questions by the prosecution frequently provide a convenient opening for more exploration of a fertile area on cross examination.

■ As part of its case, the government called defendant Craig's secretary, Sherron Ackley, as a witness. Defendants contend that the government called Ackley for the sole purpose of discrediting her before the defendants had an opportunity to call her as their witness. We find no merit to this contention.

Ackley corroborated Steigberg's testimony that she was Craig's secretary in November 1971 and that she did fly to Craig's home to deliver some materials. Ackley also testified that she delivered to Craig the envelope that she had received from Steigberg.

However, contrary to Steigberg's testimony, Ackley testified that the envelope which she received from Steigberg was received in March, 1972. Ackley denied that she was ever uncertain as to when the receipt of the envelope took place. The government impeached Ackley's testimony with respect to her certainty as to March 1972 receipt of the letter by eliciting admissions from Ackley that she may have told a government agent that she was not certain when she received the envelope from Steigberg.

Although Ackley's testimony appeared to be of minor value to the government's case, it was nevertheless important because her testimony provided direct evidence that Craig had received the Steigberg envelope containing the extortion money. Under the circumstances of this case, Ackley's testimony as to her certainty of the date of the receipt of the envelope from Steigberg rendered Ackley properly impeachable under Rule 607 F.R.Evid.

Defendants finally contend that since there is no requirement in a "color of official right" Hobbs Act case to prove coercion,[8] testimony by the victims as to their state of mind at the relevant time should not have been allowed. We believe that the state of mind testimony of the victims was admissible to show that the victims' consent was induced by defendant's office.

For the foregoing reasons, the defendants' convictions are affirmed.

AFFIRMED.

---

8. *E. g., United States v. Staszcuk*, 502 F.2d 875, 882–3 (7th Cir.) *cert. denied*, 423 U.S. 837, 96 S.Ct. 65, 46 L.Ed.2d 56 (1975).