**UNITED STATES of America, Plaintiff-Appellee,**

v.

**John HEDMAN, Michael Jercich, Thomas Karnick and Henry Larsen, Defendants-Appellants.**

**Nos. 78–2617, 78–2618, 78–2619 and 78–2654.**

United States Court of Appeals, Seventh Circuit.

Argued Sept. 24, 1979.

Decided Aug. 29, 1980.

Rehearing and Rehearing En Banc Denied Oct. 30, 1980.

Julius Lucius Echeles, Anna R. Lavin, Chicago, Ill., for defendants-appellants.

Thomas P. Sullivan, U. S. Atty., Thomas P. Johnson, Asst. U. S. Atty., Chicago, Ill., for plaintiff-appellee.

Before SWYGERT, PELL and BAUER, Circuit Judges.

BAUER, Circuit Judge.

Defendants-appellants in these consolidated cases appeal from the judgments of conviction entered upon the jury verdicts finding them guilty of conspiracy to commit extortion and extortion under color of official right in violation of the Hobbs Act. Appellants also appeal from their convictions for filing fraudulent tax returns in violation of the federal income tax laws. We affirm.

I. *FACTS*

On June 13, 1978, the federal grand jury returned a nineteen count indictment charging the defendants, John Hedman, Mi-

chael Jercich, Thomas Karnick and Henry Larsen, with various violations of federal statutes arising from the acceptance of monies allegedly extorted by them in their capacities as Building Inspection Supervisors assigned to the Construction and Technical Inspection Bureau of the City of Chicago. Count One of the indictment charged all four defendants with conspiracy to commit extortion through the wrongful use of their official positions, in violation of 18 U.S.C. § 1951.[1] Counts Two through Thirteen of the indictment charged the defendants individually with substantive violations of Section 1951 by the extortion of money from various building contractors under color of official right. Counts Fourteen through Nineteen charged defendants Hedman, Jercich and Larsen with the failure to report the income received from these extortionate activities on their federal income tax returns for the years 1973 and 1974, in violation of 26 U.S.C. § 7206(1).

All four defendants were tried jointly before a jury with the Honorable Nicholas J. Bua presiding. On November 15, 1978, at the conclusion of a two week trial, the jury returned guilty verdicts against each defendant on all counts of the indictment, with the exception that Michael Jercich was found not guilty in Count Twelve. On December 19, 1978, Judge Bua sentenced defendants Hedman, Jercich and Larsen each to one year in the custody of the Attorney General, three years' probation, and imposed a $5,000 fine. Thomas Karnick was sentenced to one year of custody on a work-release program, three years' probation, and received a $1,000 fine.

In view of the numerous claims of error asserted on appeal, and because many of the contentions raised concern the quality and sufficiency of the evidence, a summary recitation of the evidence adduced at trial is warranted. Other pertinent factual material necessary to an understanding of our resolution of these claims is appropriately set forth in the discussion that follows.

The evidence at trial showed that the defendants commenced their employment with the City of Chicago during the 1950's as inspectors for the Department of Buildings. In 1969 and 1970, they were promoted to the positions of Supervisor. In those positions, the defendants were responsible for supervising the inspection, by six district inspectors, of all new construction and remodeling in the geographical areas of the City of Chicago to which they had been assigned. The Chicago Building Code requires that anyone who undertakes any construction work, structural repairs, additions or remodeling in the city, secure a building permit from the Department of Buildings. The fee for such permits varies with the type of construction undertaken. For example, the permit fee for a frame garage was $24 in 1971 and $47.50 in 1976. Once the permit is obtained, the construction may proceed. At various stages of the construction a building inspector from the City of Chicago inspects the project to insure compliance with the building code. Upon completion of the construction, the inspector validates the permit.

## A. Counts One through Five

These counts alleged the receipt of extortionate payments by the defendants from

---

1. The Hobbs Act provides, in pertinent part:
 (a) Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires so to do, or commits or threatens physical violence to any person or property in furtherance of a plan or purpose to do anything in violation of this section shall be fined not more than $10,000 or imprisoned not more than twenty years, or both.
 (b) As used in this section—
 \* \* \* \* \* \*
 (2) The term "extortion" means the obtaining of property from another, with his con-

 sent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right.
 (3) The term "commerce" means commerce within the District of Columbia, or any Territory or Possession of the United States; all commerce between any point in a State, Territory, Possession, or the District of Columbia and any point outside thereof; all commerce between points within the same State through any place outside such State; and all other commerce over which the United States has jurisdiction.
 18 U.S.C. §§ 1951(a), (b)(2), (3).

the Danley Lumber Company, an Illinois corporation whose principal business is the construction of residential garages. In the course of its business, Danley annually purchases approximately $1,000,000 in building materials from manufacturers outside the State of Illinois.

Since its inception in 1959, Danley has constructed a substantial number of garages in Chicago that violated the Building Code, usually because the garages were too large or too close to the lot line. On such occasions, Danley would either fail to obtain a building permit or obtain one through the submission of a false application. For these jobs, Danley would make illegal payoffs to the defendants.

Between 1959 and the mid-1960's Bentley Weitzman, the President of Danley, would pay $25 to the building inspector for the district in which the non-conforming garage was being erected. The money for these payoffs was obtained from the receipts for construction work that was performed but not recorded on Danley's books. Weitzman testified that these receipts were also not reported on Danley's tax returns. From the mid-1960's until 1976, the task of making payoffs on construction that violated the Chicago Building Code was handled by Bentley Weitzman's father, Harry Weitzman. When a job did not violate the building code, Harry Weitzman would file a permit application and pay the required fee to the City of Chicago.

A routine procedure was established at Danley for processing non-conforming garages. When a job violated the Building Code, the employee at Danley who processed that job order would give Harry Weitzman a slip of paper indicating the address of the job and a notation that a violation existed. Weitzman would then write the name of the area supervisor for that job on the slip, and return the slip to the job file. At the same time, Weitzman would make an entry on a list he maintained of all non-conforming jobs. When the garage was being built, the slip would be returned to Weitzman. He accumulated slips for several days and then gave them to

Irving Lazarus, Vice President of Danley. Lazarus would obtain cash from a walk-in safe located in Danley's offices, place $25 per slip in an envelope with the slips, and give the money and slips to Weitzman. Bentley Weitzman testified that, on occasion, he also provided the cash to his father.

When Harry Weitzman received the cash and slips from Lazarus, he would delete the job addresses from his list. He would then write the name of the supervisors on separate envelopes, place the appropriate amount of money in each envelope, and personally deliver them to all four defendants at either their offices in City Hall or their homes. On occasion, Weitzman would give to one supervisor an envelope to be delivered to another supervisor.

From 1968 or 1969 until 1976, Harry Weitzman kept a diary of these payoffs. At the top of each page of the notebook, Weitzman wrote the first name of a supervisor, e. g., "Mike," "Tom," "Hank," and "John." Also listed on these pages were the addresses of the non-conforming job sites, as well as the amounts, the dates, and the places of the payments made to each supervisor for those jobs. The diary detailed payments that were made to all four defendants individually, as well as payments that were made to one supervisor for delivery to another.

### B. *Counts Six through Eight*

These counts related to the extortionate payments allegedly received by Hedman, Jercich and Larsen from the All State Lumber Company. All State is an Illinois corporation engaged in the construction of garages and obtains building materials from manufacturers and suppliers located outside of Illinois.

Like the Danley Lumber Company, All State built garages that violated the Chicago Building Code. On such occasions, All State would not obtain a building permit, but would instead make a payoff to the Building Inspection Supervisor assigned to the district in which the garage was constructed.

When All State commenced a job that violated the Building Code, either the garage superintendent or the remodeling superintendent would telephone the appropriate supervisor and give him the address of the non-conforming job site. The All State employee would then give a slip of paper to the assistant bookkeeper, indicating the job name, the address, the supervisor and the amount of money to be paid to the supervisor. The bookkeeper would then write the name and address of the job on a separate piece of paper and place it, along with $25, into an envelope bearing the supervisor's name. The envelope often contained several job slips and amounts of money ranging from $25 to $100. The supervisors would then stop by the All State office and pick up the envelopes bearing their names. Three of the defendants, John Hedman, Michael Jercich, and Henry Larsen, received payoffs in this fashion from All State. On occasion, one supervisor would pick up the envelopes addressed to another supervisor.

The money used for the payoffs was obtained from the All State petty cash fund and was recorded on All State's books as a "permit fee." Thus, each entry in the All State accounts of $25 for a "permit" reflected a payoff. By comparing the assignment maps of the Department of Buildings to the address of each payoff, it was possible to approximate the amount of money paid to each of the three supervisors. Between 1971 and 1974, approximately $11,575 was paid collectively to the supervisors by the All State Lumber Company.

C. *Counts Nine and Ten*

These counts related to payoffs allegedly made to defendants Hedman and Jercich by the Ashland Building and Improvement Company, a firm engaged in general repair work and specializing in porch construction. Ashland purchased building materials and supplies from Lee Lumber, which acquired these materials from out of state manufacturers.

On a number of occasions, Ashland would start a job before a permit was obtained or complete a job in violation of the Building Code and fail to secure a permit. For these jobs, Ashland would pay money to Building Inspection Supervisors for the City of Chicago who were in charge of inspection for the districts where the non-conforming jobs were located. Frank Spatz, the President of Ashland, would either telephone the appropriate supervisor at his home or at City Hall, or the supervisor would visit Ashland's corporate offices. Spatz would inform the supervisor of the job violation and its location. After talking with Spatz, the supervisor would stop by Ashland's offices and receive the payoff from Spatz, or if Spatz was not in the office at the time, the money would be left in an envelope for the supervisor to pick up. Payments to the supervisors would be made either in cash or by check. Ashland checks were written to both John Hedman and Michael Jercich in the amounts of $100 each. In several instances, Michael Jercich directed that the checks issued to him be made payable to other payees.

Spatz maintained a written record of the payoffs that were owed, and after a payment was made he destroyed the record. The source of the funds for the payoffs was Spatz's personal salary and expense account at Ashland. When a payoff was to be made, Spatz would withdraw the amount to be paid in cash from an envelope kept in a safe at Ashland's offices or direct his secretary to prepare a check in the appropriate amount. A job order number was inscribed on each check to indicate the job for which the payment had been made, and the checks were recorded on Ashland's books as "finder's fees." Spatz would then place the money in a drawer in his office before paying the supervisors or would give it to his secretary for delivery in his absence.

D. *Counts Eleven and Twelve*

These counts involved payoffs allegedly made to defendants Hedman and Jercich by Airoom, Inc. Airoom is a construction company that specializes in building room additions in Chicago and its suburbs. Airoom purchased lumber for its construction projects from Rubenstein Lumber, which in

turn purchased all of its lumber from suppliers outside of Illinois.

Airoom would sometimes begin construction in Chicago before a building permit was obtained, or would perform the work without ever obtaining a permit. On these occasions, the construction superintendents of Airoom were authorized to make payoffs to building inspectors. Burton Klein, President and owner of Airoom, testified that he would telephone defendant Hedman and provide him with the name and address of the non-permit job. Hedman would then telephone Klein to arrange a meeting at either Airoom's offices or at a restaurant. At these meetings, Klein would pay Hedman in cash from his Airoom salary. Klein paid Hedman for approximately ten jobs built by Airoom in Chicago. The payment was usually $25 for a job commenced without a permit and $50 for a job completed without a permit. Finally, Klein testified that he met with defendants Hedman and Jercich in late 1975, and that Hedman advised him to destroy any records that might relate to jobs for which payoffs had been made.

### E. *Count Thirteen*

This count relates to payoffs allegedly made to John Hedman by Solar Construction Company. Solar, which builds garages and room additions in Chicago and the surrounding suburbs, acquired its building materials from the Maher Lumber and Hardware Company of Illinois. Maher in turn purchased all of its building materials and supplies from businesses located outside of Illinois.

Between 1972 and 1974 Solar completed approximately sixty-five jobs in Chicago without obtaining building permits. On other occasions, Solar would obtain a building permit but construct a garage that did not conform to the permit. In either of these cases, Robert Pareti, owner of Solar, would telephone Hedman at City Hall or at his home to advise him of the deficiency. In most instances, Hedman would give his consent over the telephone and Pareti would make a notation on the job file. Par-

eti would then arrange for a Solar check payable to a fictitious payee or to "cash" to be sent to Hedman's residence. These payoffs were recorded on Solar's books as "permit" expenses.

### F. *Counts Fourteen through Nineteen*

These counts charged defendants Hedman, Jercich and Larsen with the failure to report the payoffs received from the above contractors on their federal income tax returns for 1973 and 1974.

John Hedman filed a federal income tax return for 1973 in which he stated that his income was $16,426. In his 1974 tax return, Hedman stated that his income was $19,214. On both returns, Hedman listed as his sources of income wages and mileage reimbursements from the City of Chicago, interest income, and an income tax refund from the State of Illinois. He did not report as income the approximately $1,125 in payoffs he received in 1973 and the approximately $1,575 received in 1974.

Henry Larsen stated on his 1973 and 1974 federal income tax returns that his income was $18,703 and $20,977.63, respectively. He did not report $1,125 received as payoffs in 1973 or the $800 he received in 1974.

Similarly, Michael Jercich failed to include as income the payoffs he received for 1973 and 1974. His adjusted gross income for 1973 was reported as being $18,087.72, which did not include $1,925 received as payoffs. His adjusted gross income for 1974 was $17,343.45, which did not include $1,850 he received in payoffs during that year.

## II. *SUFFICIENCY OF THE EVIDENCE*

In their first principal argument on appeal, appellants contend the evidence adduced at trial was insufficient to sustain the jury's verdicts. We conclude that the evidence cited above, viewed in the light most favorable to the government, clearly supports the jury's findings. *United States v. Guevara*, 598 F.2d 1094, 1096 (7th Cir. 1979).

**1192**

### A. Conspiracy

■ Appellants argue the evidence was insufficient to permit a finding that they were guilty of conspiracy to commit extortion, as charged in Count One of the indictment. A conspiracy consists of a combination or confederation between two or more persons formed for the purpose of committing, by their joint efforts, a criminal act. An agreement is the primary element of a conspiracy, but a formal agreement need not be demonstrated. *United States v. Varelli*, 407 F.2d 735 (7th Cir. 1969). Although proof of knowledge on the part of the participant in the conspiracy is also an essential element of the offense, circumstantial evidence is sufficient to connect an alleged co-conspirator with the conspiracy. *United States v. Page*, 580 F.2d 916 (7th Cir. 1978).

Applying these principles to the evidence of conspiracy adduced at trial, it is clear that the government presented sufficient evidence to sustain the jury's verdict. Count One related to extortionate payments made by Danley Lumber Company to all four defendants. The evidence showed that from approximately 1968 until 1973, the defendants were the only area supervisors in the New Construction Bureau of the Department of Buildings. During that period of time, each defendant received illegal payoffs from Danley in the same amount, in the same manner, for the same reason, and from the same individual, Harry Weitzman. It was further established that on over 80 occasions, one of the defendants would accept illegal payments on behalf of the other defendants. All four defendants therefore acted as conduits for the others. Moreover, on such occasions, the conduit would also receive an illegal payment thereby negating the hypothesis that the conduit did not know the contents of the envelopes destined for others. Weitzman's payment procedure involved advising a defendant of the address to which a payment related and the address for which the defendant would be paid in the future. Thus, from Weitzman's testimony that, with one exception, no defendant ever complained of not receiving a payment, the jury could infer that each conduit payment was completed.

■ Accordingly, the evidence established the elements of conspiracy to commit extortion under "color of official right" by showing a joint venture to obtain illegal payments through the use of the defendants' official positions.

### B. Interstate Commerce

Appellants also contend that the evidence failed to prove the requisite effect on interstate commerce under the Hobbs Act. The government relied on the "depletion of assets" theory to establish that element at trial. Under this theory, commerce is affected when "an enterprise, which either is actively engaged in interstate commerce or customarily purchases items in interstate commerce, has its assets depleted through extortion, thereby curtailing the victim's potential as a purchaser of such goods." *United States v. Elders*, 569 F.2d 1020, 1025 (7th Cir. 1978). We conclude that the evidence was sufficient to establish the jurisdictional nexus between the extortionate conduct and interstate commerce.

■ Appellants first argue that because the net long-term effect of the extortionate payments was to increase the assets of the companies involved, there was no depletion of assets shown. This argument ignores the fact that Hobbs Act convictions sustained under this theory involved in payments to obtain a financial benefit or to avoid a financial loss. *See, e. g., United States v. Craig*, 573 F.2d 513 (7th Cir. 1978); *United States v. DeMet*, 486 F.2d 816 (7th Cir. 1973), *cert. denied*, 416 U.S. 969, 94 S.Ct. 1991, 40 L.Ed.2d 558 (1974). The focus of the "depletion of assets" theory is the payment itself. If that money is derived from a source which otherwise could be devoted to the purchase of interstate materials, the law presumes a potential effect on commerce sufficient to satisfy that element of the offense. *United States v. Elders, supra* at 1024.

Appellants further argue that the depletion of assets theory was not proved by the

government's evidence. We disagree. The evidence showed that each of the companies which made payments to the defendants purchased building materials which were manufactured outside of Illinois. Danley Lumber Company purchased approximately one million dollars worth of various building materials, including lumber, garage doors and siding, each year. Similarly, All State Lumber Company purchased thousands of dollars worth of various building materials from manufacturers outside of Illinois. Ashland Building and Supply Company acquired lumber, doors and windows from Lee Lumber, which acquired these materials from suppliers outside of Illinois. Rubenstein Lumber supplied Airoom, Inc. with building materials which were not manufactured in Illinois. Finally, the evidence showed that Solar Construction Company acquired certain of its building materials from the Maher Lumber and Hardware Company, whose suppliers were also located outside of Illinois during the time period alleged in the indictment.

Evidence was also presented by the government which showed that the extortionate payments were made either directly or indirectly with company funds which could otherwise have been used to purchase interstate building materials. Danley Lumber Company made payments to all four defendants. Bentley Weitzman, the President of Danley, testified that the monies paid to the defendants on the occasions that he provided payoff money were from corporate funds obtained from Danley's unreported gross receipts. All of the payoffs charged in the indictment were made by his father, Harry Weitzman, who testified that most of the payoff monies were given to him by Irving Lazarus, the Vice President of Danley. The evidence showed that the funds Lazarus provided Harry Weitzman

came from a walk-in safe located at Danley's corporate offices. The fact that the money was kept in Danley's safe, together with the testimony of Bentley Weitzman that whenever he provided payoff money it was from corporate funds, was sufficient for the jury to infer that the money taken from the safe was also Danley's money.[2]

The evidence as to the source of funds used by the other companies showed that All State Lumber Company's assistant bookkeeper, Marci Pugno, would use money taken from All State's petty cash fund to make payoffs to Hedman, Jercich and Larsen. Payments from Ashland Building and Improvement Company were made either by Ashland checks or with cash taken from Ashland's safe and charged to the personal salary and expense account of Frank Spatz, the sole owner of Ashland. Airoom, Inc. payments to the defendants were made in cash by its President and owner, Burton Klein, from the salary he received from Airoom. Solar Construction Company's payments were made by checks drawn against Solar's account, and these payments were recorded in Solar's cash disbursement journals and job ledgers.

■ Thus, from the evidence indicating that each construction company purchased building materials manufactured outside of Illinois and the evidence indicating that the money used for the extortionate payments came either directly or indirectly from the assets of these companies, the jury properly could have concluded that commerce had been affected under the depletion of assets theory because there was a "realistic probability" that these monies would have been used to purchase materials that were part of interstate commerce. *United States v. Staszcuk*, 517 F.2d 53, 60 (7th Cir.) (*en banc*), *cert. denied*, 423 U.S. 837, 96 S.Ct. 65, 46 L.Ed.2d 56 (1975).

---

**2.** Appellant Karnick argues in his reply brief that the evidence failed to show that the payments he allegedly received were from Danley's corporate funds because the trial court specifically instructed the jury not to consider the testimony of Bentley Weitzman as evidence in the case against Karnick. Tr. at 131. However, Betty Jan Mack, who was employed as the office manager and secretary for Danley,

testified that between 1972 and 1975 she observed Irving Lazarus remove cash from the walk-in safe, place the cash in an envelope, and give it to Harry Weitzman approximately once a week. Thus, independent of Bentley Weitzman's testimony, this evidence was sufficient to enable the jury to conclude that the monies taken from the safe by Lazarus were corporate funds used for business purposes.

## C. *Extortion*

■ Finally, the appellants contend the government's proof of extortion was defective because the evidence failed to show that the monies received by appellant Hedman were monies that were "not due them" as alleged in the indictment. Burton Klein, president and sole shareholder of Airoom, Inc. testified that $25 would be paid to Hedman on jobs that were commenced without a permit and $50 would be paid on jobs that were completed without a permit. No testimony was elicited on either direct or cross-examination that the money was owed to Hedman, the Department of Buildings, or the City of Chicago. In the absence of such evidence, together with the fact that the money was paid only when construction was started before a permit was obtained or when no permit was obtained, the jury could have reasonably found that the money was not lawfully due Hedman or the City of Chicago.

Appellants urge a similar contention with regard to the monies paid to Hedman by Solar Construction Company. The evidence showed that Robert Pareti, the owner of Solar, paid Hedman $25 when a job was to be done without a permit. Absent testimony or other evidence to the contrary, the jury was entitled to conclude that the money was not lawfully owed to Hedman, the Department of Buildings, or the City of Chicago.

■ We also find no merit in the contention that extortion was not shown regarding the All State Lumber Company because its owner, Frank Spatz, was "happy" to make the payments. As this Court observed in *United States v. DeMet*, 486 F.2d 816 (7th Cir. 1973), *cert. denied*, 416 U.S. 969, 94 S.Ct. 1991, 40 L.Ed.2d 558 (1974): "The fact that relations between the victims and the extorters were often cordial is not inconsistent with extortion." *Id.* at 820 (citation omitted).

We therefore conclude that the evidence adduced at trial, viewed in the light most favorable to the government, was sufficient to establish each element of each count of the indictment beyond a reasonable doubt.

## III. *JURY INSTRUCTIONS*

In their second principal argument on appeal, the appellants contend that the trial court erred in certain of its instructions to the jury. We find the arguments advanced in support of this contention to be without merit.

## A. *Color of Official Right*

Appellants Hedman, Jercich and Larsen argue that the jury was improperly instructed on the elements of extortion "under color of official right." [3] Specifically, the appellants claim that it was error to refuse their tendered instructions which in substance would have required the government to show that the appellants were the "initiators" or "inducers" of the alleged payments and that the payors were not seeking that to which they were not entitled.[4] Absent these elements, the appel-

---

**3.** Appellant Karnick raises an analogous argument that the evidence adduced at trial was insufficient to sustain his conviction under the Hobbs Act because the government failed to establish those same elements which the defendants were unable to present to the jury through their tendered and refused instructions.

**4.** The trial court instructed the jury as follows:

The jury is further instructed that extortion under color of official right means the obtaining of money by a public official through wrongful use of his office when the money obtained was not lawfully due and owing to him or to the office which the public official represented.

It does not matter whether the public official induces the payment to perform his duties or not to perform his duties. Extortion under color of official right does not require proof of specific acts by the public officials demonstrating force, threats, or the use of fear so long as the victim consented because of the office or position held by the official who obtained the money.

If the public official knows the motivation of the victim focuses on the public official's office and money is obtained by the public official which was not lawfully due and owing to him or the office he represented, that is sufficient to satisfy the requirements of the law of extortion under color of official right.

lants contend that bribery rather than extortion was established and that accordingly, the government failed to prove a violation of the Hobbs Act.

■ It is settled law in this Circuit as well as others[5] that in a Hobbs Act prosecution for extortion under color of official right it is unnecessary to show that the defendant induced the extortionate payment or that the payor was entitled to the benefit obtained from such payment. The government is merely required to prove that a public official obtained money to which he was not entitled and which he obtained only because of his official position. As this Court stated in *United States v. Braasch*, 505 F.2d 139 (7th Cir. 1974):

> Appellants, however, overlook the fact that the evidence shows that the conspirators used the power and authority vested in them by reason of their office to obtain money not due them or due the office. The use of office to obtain payments is the crux of the statutory requirement of "under color of official right", and appellants' wrongful use of official power was obviously the basis of this extortion. *See United States v. Staszcuk*, 502 F.2d 875 (7th Cir. 1974). It matters not whether the public official induces payments to perform his duties or not to perform his duties, or even, as here, to perform or not to perform acts unrelated to his duties which can only be undertaken because of his official position. So long as the motivation for the payment focuses on the recipient's office, the conduct falls within the ambit of 18 U.S.C. § 1951. That such conduct may also constitute "classic bribery" is not a relevant consideration.

> The mere voluntary payment of money would not constitute extortion.
> Furthermore, that the transaction may also have constituted bribery is of no consequence in considering whether extortion under color of official right was committed.
> The same transaction may constitute bribery by the person paying the money and extortion under color of official right by the public official who receives it.
Tr. at 1568-69.

*Id.* at 151. *See United States v. Kuta*, 518 F.2d 947, 950 (7th Cir.), *cert. denied*, 423 U.S. 1014, 96 S.Ct. 446, 46 L.Ed.2d 385 (1975); *United States v. Crowley*, 504 F.2d 992, 995 (7th Cir. 1974); *United States v. Gill*, 490 F.2d 233 (7th Cir. 1973).

Since the instruction given by the court in this case complied with this standard, we find no error.

**B. Interstate Commerce**

Appellants next argue that the trial court improperly instructed the jury on the element of the effect on interstate commerce required under the Hobbs Act. The appellants contend, and their instructions rejected by the court stated, that the government was required to prove an *adverse* effect on commerce. Neither the literal language of the statute nor the case law supports this contention.

■ It has been held that the Hobbs Act prohibits interference with commerce "in any way or degree," *United States v. Stirone*, 361 U.S. 212, 80 S.Ct. 270, 4 L.Ed.2d 252 (1960), and that it "should be given an expansive interpretation to cover a wide range of extortionate activity." *United States v. Elders*, 569 F.2d 1020, 1023 (7th Cir. 1978). Thus, this Court has found the commerce element to be satisfied where the actual impact on commerce is *de minimis*, *United States v. Crowley*, *supra*, or where, in the absence of proof of an actual impact, there is a realistic probability that the extortionate transaction will have some effect on interstate commerce. *United States v. Blakey*, 607 F.2d 779, 783 (7th Cir. 1979). Moreover, evidence establishing a positive or beneficial impact on commerce has been held to be sufficient to sustain federal juris-

5. *See United States v. Harding*, 563 F.2d 299, 305, 307 (6th Cir. 1977); *United States v. Hathaway*, 534 F.2d 386, 393 (1st Cir. 1976); *United States v. Brown*, 540 F.2d 364, 372 (8th Cir. 1976); *United States v. Hall*, 536 F.2d 313, 321 (10th Cir. 1976); *United States v. Price*, 507 F.2d 1349, 1350 (4th Cir. 1974) (*per curiam*); *United States v. Mazzei*, 521 F.2d 639, 643 (3d Cir. 1975); *United States v. Trotta*, 525 F.2d 1096, 1098-1099 (2d Cir. 1975).

diction under the Hobbs Act, *United States v. Staszcuk, supra* at 878; *United States v. Kuta, supra* at 950–951. Accordingly, the appellants were not entitled to an instruction requiring the jury to find that the extortionate conduct charged in the indictment constituted an adverse effect on interstate commerce.

### C. Tax Evasion

Finally, the appellants argue that the trial court improperly instructed the jury on the law concerning the income tax counts charged in the indictment. We find no error.

■ The indictment alleged that appellants Hedman, Jercich and Larsen made materially false statements on their federal income tax returns for 1973 and 1974 by substantially understating their incomes for those tax years, in violation of 26 U.S.C. § 7206(1). The appellants offered an instruction which defined the term "substantial" as meaning a misstatement of gross income in excess of twenty-five percent of the amount of gross income reported on the tax return. The trial court refused the instruction on the ground that the question of what constitutes a substantial misstatement is a question of fact for the jury to decide.[6]

Section 7206(1) does not require that a false statement on an income tax return be substantial; it merely requires that the misstatement be material.[7] This Court has previously held that false statements relating to gross income, irrespective of the amount, constitute a material misstatement in violation of Section 7206(1). *United States v. Clavey,* 578 F.2d 1219 (7th Cir. 1978) (*en banc*) (adopting by reference the panel opinion at 565 F.2d 111 (7th Cir. 1977) on this point); *see also United States v. DiVarco,* 484 F.2d 670, 673 (7th Cir. 1973), *cert. denied,* 415 U.S. 916, 94 S.Ct. 1412, 39 L.Ed.2d 470 (1974). Moreover, appellant's reliance on Section 6501(e) of the Internal Revenue Code, which defines substantial for purposes of civil liability as a misstatement in excess of twenty-five percent of the amount of the gross income reported on the return, is clearly misplaced in the context of a criminal prosecution under Section 7206(1). We therefore conclude that the trial court properly instructed the jury with respect to the tax counts alleged in the indictment.

## IV. FAIR TRIAL ISSUES

Appellants next contend that they were denied a fair trial, citing numerous trial errors relating to the admissibility of certain evidence and prosecutorial misconduct. Appellants also challenge their convictions on certain counts of the indictment as time-barred by the statute of limitations. We

---

6. The trial court instructed the jury as follows:
 To convict a defendant, the government must prove each of the following three elements beyond a reasonable doubt:
 1. the willful making and subscribing of a return filed with the Internal Revenue Service that was incorrect as to a material matter;
 2. that the return contained a written declaration that it was made under the penalty of perjury; and
 3. that the defendant did not believe the return to be true and correct as to the material matter charged in the indictment.
 The jury is further instructed that each of the tax counts alleges that the particular defendant received substantial other income in addition to the total income reported on the return. It is not necessary for the government to prove the exact amount of the additional income. It is sufficient if the government proves beyond a reasonable doubt that the defendant had income substantially in excess of the total income he reported on his return.
 The false statement alleged in each of the tax counts is that the total income reported on the return involved did not contain substantial other income purportedly received by the particular defendant. The Court instructs you that a statement of total income on a tax return is material as a matter of law. Tr. at 1572 1573.

7. Section 7206(1) provides, in pertinent part:
 Fraud and false statements
 Any person who—
 (1) Declaration under penalties of perjury.
 —Willfully makes and subscribes any return, statement, or other document, which contains or is verified by a written declaration that it is made under the penalties of perjury, and which he does not believe to be true and correct as to every material matter; . . . .

consider these contentions, and facts relevant thereto, *seriatim*.

## A. *Admissibility of Diary*

█ In presenting its evidence related to the counts involving the Danley Lumber Company, the government offered into evidence a diary kept by Harry Weitzman, the Danley employee responsible for making payoffs to Chicago Building Inspection Supervisors. Over the vigorous objections of the appellants, the trial court admitted the diary as a business record under Rule 803(6) of the Federal Rules of Evidence.[8] Appellants have renewed their objection on appeal.[9] We conclude that the trial court did not abuse its discretion in admitting the diary into evidence.

Harry Weitzman testified that after several years of making payoffs on behalf of Danley to Building Inspection Supervisors, he began recording these payoffs in a small notebook. The notebook contained an entry for every payoff he had made from 1968 or 1969 until 1976. An entry would be recorded in the office after a payment had been made. Harry Weitzman kept the diary in his desk at work and did not make the diary available to other employees at Danley. Weitzman further testified that the reason for maintaining the diary was to provide documentation if Irving Lazarus, the Vice President of Danley, ever demanded an accounting of the payments made to the supervisors. Despite objections by defense counsel that the diary was inadmissible under Rule 803(6) because it was not used or relied on by other Danley employees, nor required to be kept by Weitzman, and contained inaccuracies, Judge Bua admitted the diary on the basis of the foundation testimony, stating:

> The Court: I have heard enough. Mr. Newman, I think the key here in deciding this matter is whether the books record a regularly conducted business activity as opposed to some personal matter that the scrivener or the one who keeps the record is recording, and while it is a close case, I think it comes within the purview of 803(6).
>
> The court takes the position that really this goes—all of your arguments of the defense go, good arguments, go to the weight rather than to the admissibility, and the diary may be introduced into the record pursuant to the provisions of 803(6) of the Federal Rules of Evidence.

Tr. at 281–282.

We agree with the district court that the diary was admissible. In that connection, our decision in *United States v. McPartlin*, 595 F.2d 1321 (7th Cir. 1979), is especially pertinent. In *McPartlin*, the government sought to admit into evidence desk calendar-appointment dairies authored by and containing records of the daily business activities of a witness. The diaries were kept

---

8. Rule 803(6) of the Federal Rules of Evidence provides:

 *Records Of Any Regularly Conducted Activity*: A memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions, or diagnoses, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record, or data compilation, all as shown by the testimony of the custodian or other qualified witness, unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness. The term "business" as used in this paragraph includes business, institution, association, profession, occupation, and calling of every kind, whether or not conducted for profit.

9. Subsequent to the submission of briefs and oral argument in this case, the appellants filed with the Court a "Motion To Remand To The Trial Court For Further Proceedings" on the ground that they had received information concerning an Internal Revenue Service investigation into "certain improper statements made by Special Agent Wayne Buback," which purported to impugn the integrity of the diary. The government, in response to this motion, filed with the Court a sealed copy of the Report of the Investigation conducted by the Internal Revenue Service. Upon an *in camera* examination of the Report, we conclude that no information contained therein need be produced pursuant to *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). Accordingly, the motion is denied.

strictly for the use of the witness and the entries therein were recorded at or near the time of the activity. The defendants in *McPartlin* objected to the admissibility of the diaries as business records because the entries were not made in sequence and because the diaries were relied on only by the witness. We upheld the admissibility of the diaries under Rule 803(6) on the grounds that they were records kept as part of a business activity and the entries were made with regularity at or near the time of the described event, and that verification by persons other than the one making the entry was unnecessary to establish verification. Moreover, we noted that since the witness had to rely on the entries made, there would be little reason for him to distort or falsify the entries. Finally, we observed that the degree of reliability necessary for the admission of diaries under the business record exception to the hearsay rule was greatly reduced because the declarant testified and was available for cross-examination. *McPartlin, supra* at 1347–1351.

The *ratio decidendi* of *McPartlin* is equally applicable to the contested admissibility of the diary in this case. Harry Weitzman testified that he kept the diary as part of a business activity. The entries were recorded with regularity at or near the date of the payoffs. Since Weitzman believed that he would be required to account to Lazarus for the payments, it was unlikely that he would have made false entries. Similarly, the fact that Weitzman was not told to keep the diary and did not make it available to others at Danley does not affect its admissibility under Rule 803(6). Finally, in this case, as in *McPartlin*, that the diaries recorded illicit business dealings is of no consequence; the illegal nature of those activities were nevertheless part of the normal business of Danley. *McPartlin, supra* at 1349.

**B.** *Admissibility of Immunity Testimony*

 Appellants also challenge the admissibility of testimony elicited by the government on direct examinations of

Bentley Weitzman, Harry Weitzman and Betty Mack, employees of the Danley Lumber Company, concerning the fact that they had been granted immunity. Appellants objected at trial that this testimony was inadmissible because it was used to enhance the credibility of these witnesses rather than to impeach it.

Rule 607 of the Federal Rules of Evidence provides that "[t]he credibility of a witness may be attacked by any party including the party calling him." The government introduced the challenged testimony for purposes of impeachment because it anticipated that defense counsel would cross-examine the witnesses on the issue of immunity. This Court previously endorsed such a procedure in *United States v. Craig*, 573 F.2d 513 (7th Cir. 1978), wherein we observed:

> Defendants further argue that questions and answers concerning the immunized witness' understanding of the terms of immunization convey to the jury the impression that the prosecutor is in a position to personally know whether or not a witness is truthful, and that consequently, the jury is given the appearance of a witness whose veracity is vouched for by the government.
>
> We find nothing improper about the question of the witness' understanding of the terms of the immunity order in this case. There was no insinuation by the prosecutor, direct or otherwise, that the government possessed knowledge to the exclusion of the jury on the issue of the immunized witness' veracity. *Cf. United States v. Creamer*, 555 F.2d 612 (7th Cir. 1977). Further, we believe that the jury's function of assessing credibility and weighing testimony is aided by evidence of an immunized witness' understanding of the terms under which he or she is testifying. Indeed, such questions by the prosecution frequently provide a convenient opening for more exploration of a fertile area on cross-examination.

537 F.2d at 519. We are aware of no persuasive authority to the contrary. The testimony concerning immunity in this case

fails to reflect an implication that the government possessed knowledge to the exclusion of the jury on the issue of the immunized witnesses' veracity. Moreover, the trial court instructed the jury that the credibility of the immunized witnesses was susceptible to special scrutiny. Tr. at 1557. Accordingly, we find no impropriety in the admission of this testimony into evidence.

## C. *Prosecutorial Misconduct*

 Appellants next argue that they were deprived of a fair trial on the basis of prosecutorial misconduct during the government's closing arguments. Specifically, the appellants object to statements of the prosecutor during rebuttal argument that the "victims" in this case were the citizens of Chicago because the city had been denied revenues by the appellants' extortionate activities. This comment was engendered by defense counsel's assertion during closing argument that the government's proof failed to establish that the Danley Lumber Company and others were victims, as charged in the indictment, because these companies profited from the alleged extortionate activities of the defendants. Since the indictment did not allege the existence of any "victim," the prosecutor's rebuttal argument clearly constituted invited response. It is well settled that where defense counsel makes statements in closing argument that invite the government to respond, the prosecutor may, on rebuttal, enter into areas that would otherwise constitute improper argument. *Malone v. United States*, 94 F.2d 281, 288 (7th Cir.), *cert. denied*, 304 U.S. 562, 58 S.Ct. 944, 82 L.Ed. 1529 (1938); *United States v. Lawler*, 413 F.2d 622, 628–629 (7th Cir. 1969), *cert. denied*, 396 U.S. 1046, 90 S.Ct. 698, 24 L.Ed.2d 691 (1970). Moreover, the trial court exercised its discretion by limiting the scope of the argument and the prosecutor promptly complied with the limitations imposed by the court. The trial court also instructed the jury that closing arguments did not constitute evidence. These actions served to minimize any prejudice claimed by the appellants to have resulted from the government's rebuttal argument. *See*

*United States v. Alpern*, 564 F.2d 755, 760 (7th Cir. 1977).

## D. *Defective Indictment*

 Appellants also contend they were denied a fair trial because Counts One through Thirteen improperly charged the appellants with offenses that were time-barred by the five year statute of limitations prescribed in 18 U.S.C. § 3282. The government concedes that each of these counts alleged an offense commencing on a date outside the statute of limitations, but asserts that the indictment was not defective because each count also alleged an offense continuing until a date after June 13, 1973, five years prior to the date of the return of the indictment.

An indictment under the Hobbs Act alleging a single, continuous plan of extortion with multiple payments begun outside the statute of limitations, but continuing to a date within the statute was upheld in *United States v. Provenzano*, 334 F.2d 678 (3d Cir.), *cert. denied*, 379 U.S. 947, 85 S.Ct. 440, 13 L.Ed.2d 544 (1964). The evidence adduced at trial in this case showed that the appellants engaged in a single, continuous plan of extortion envisioning multiple payments over several years from each named company. These payments began in October 1968 and continued through May 1976, nearly three years after the statute of limitations date. Furthermore, the jury was specifically instructed that the defendants could not be convicted for any offense committed prior to June 13, 1973. We therefore find no impropriety in the charges alleged in the indictment.

## V. *SEVERANCE AND SENTENCING*

Appellant Karnick raises two further issues for review. First, he contends that his joinder with the other defendants named in the indictment was improper from the outset under Rule 8 of the Federal Rules of Criminal Procedure. Alternatively, Karnick asserts that his motions for severance pursuant to Rule 14 of the Federal Rules of Criminal Procedure were improperly denied by the trial court. Finally, Karnick chal-

lenges the sentence he received on the ground that the district court's decision constituted an abuse of its discretion.

### A. Joinder and Severance

 Rule 8 of the Federal Rules of Criminal Procedure provides for the joinder of offenses and defendants in appropriate cases. Improper joinder under Rule 8 requires mandatory severance. *United States v. Spector*, 326 F.2d 345 (7th Cir. 1963). However, a defendant must present a motion to sever based on misjoinder in order for the trial court to address itself to the issue. *See* Fed.R.Cr.P. 12(f). If the defendant fails to challenge joinder pursuant to Rule 8 prior to trial, he waives his right to raise misjoinder on appeal. *United States v. Papadakis*, 510 F.2d 287, 299–300 (2d Cir.), *cert. denied*, 421 U.S. 950, 95 S.Ct. 1682, 44 L.Ed.2d 104 (1975). Since in this case neither Karnick nor any of his codefendants contested joinder under Rule 8, we deem the question waived for purposes of this appeal.

Appellant Karnick did file a pretrial motion, subsequently renewed at trial, for severance under Rule 14 of the Federal Rules of Criminal Procedure.[10] He now contends that the trial court erred in denying these motions. We find no error.

 It is settled that a decision to grant or deny a severance under Rule 14 is discretionary and subject to reversal only upon a showing of clear abuse of that discretion. *United States v. Papia*, 560 F.2d 827, 840 (7th Cir. 1977). Our previous decisions have also emphasized that the question of whether a joint trial infringes upon the defendant's right to a fair trial depends on "whether it is within the jury's capacity, given the complexity of the case, to follow admonitory instructions and to keep separate, collate and appraise the evidence relevant only to each defendant." *United*

States v. Kahn, 381 F.2d 824, 839 (7th Cir. 1967). *See also United States v. Cervantes*, 466 F.2d 736, 739 (7th Cir.), *cert. denied*, 409 U.S. 886, 93 S.Ct. 108, 34 L.Ed.2d 143 (1972).

 Karnick claims that since he was charged in only two of the nineteen counts in the indictment, he was prejudiced by the disparity between the evidence against him and the evidence against his co-defendants. We rejected a similar argument in *United States v. Grabiec*, 563 F.2d 313 (7th Cir. 1977), in which we held:

> Although the evidence of culpability was clearly proportionately greater against [co-defendant] Wall than Grabiec, we have pointed out earlier that there was sufficient evidence for a jury to have convicted Grabiec. Also, we have emphasized that the jury was repeatedly instructed to consider evidence regarding other transactions only as it applied to Wall. Under these circumstances, the denials of Grabiec's requests for severance were not errors.

563 F.2d at 319.

The considerations found controlling in *Grabiec* are equally applicable to this case. As stated earlier, there was sufficient evidence to support the jury's verdicts against Karnick. Furthermore, the jury was repeatedly instructed to consider evidence introduced on the other counts only against the defendants charged in those counts. Finally, the jury's verdict of acquittal for appellant Jercich on Count Twelve of the indictment reflects its adherence to those admonitory instructions.

### B. Sentencing

Karnick also appeals from the sentence imposed by the district court on the grounds that the court abused its discretion in unduly emphasizing the deterrent effect upon others of the appellant's incarceration.

---

**10.** Rule 14 of the Federal Rules of Criminal Procedure provides, in pertinent part:

Relief From Prejudicial Joinder

If it appears that a defendant or the government is prejudiced by a joinder of offenses or of defendants in an indictment or information or by such joinder for trial together, the court may order an election or separate trials of counts, grant a severance of defendants or provide whatever other relief justice requires. . . .

■ The sentencing function has traditionally been considered to be within the exclusive province of the trial court, and the exercise of that discretion "will not be disturbed on appeal except on a plain showing of gross abuse." *United States v. Willard*, 445 F.2d 814, 816 (7th Cir. 1971) (citation omitted).

■ An examination of the trial court's remarks at sentencing reveals no abuse of the court's discretionary role. The court indicated that in arriving at sentences he had weighed three factors: (1) the possibility of rehabilitation; (2) the societal interest in retribution; and (3) the deterrence of others. These factors were endorsed by the Supreme Court in *Williams v. New York*, 337 U.S. 241, 69 S.Ct. 1079, 93 L.Ed. 1337 (1949).

Consideration of these factors with respect to the defendants led the court to conclude that it favored "relatively stiff sentences." Since the defendants were convicted of "white collar" crimes, Judge Bua stated that he was not concerned with rehabilitation in the usual sense, although he did note "the failure of these defendants to acknowledge guilt or display any remorse whatever." As to the societal interest, the court regarded the crime of extortion to be one of the most serious prosecuted in the federal courts and further observed that acts of extortion teach the public that "corruption, greed and lawlessness" are accepted behavior in government. Finally, Judge Bua expressed his view that the conviction and sentencing of such criminals would serve the salutary purpose of deterrence. It is within this context that the court made the "message to City Hall" statement which appellant assails as an abdication of the court's mandatory discretionary role.[11]

11. The court stated:
It is a part of my duty in sentencing these men to send a message to their fellow workers that all city workers know that justice is swift and sure in the Federal Court, and those who are convicted will be sentenced to jail.
Tr. of Dec. 19, 1978, at 16.

■ We find this objection devoid of merit. The court considered the fact that the defendants may have been influenced by an environment in which corruption seemed prevalent and acceptable to be a mitigating circumstance. The court therefore indicated that it would not impose a harsh sentence, but that future defendants should be on notice as to the court's attitude and should not expect similar light sentences. Viewing the discretionary sentencing process in light of the reasons articulated by Judge Bua for imposing a sentence of one year under a work-release program and a $1,000 fine, when the statutory maximum permitted a sentence of 20 years imprisonment and/or a $10,000 fine, it cannot be said that the court committed a gross abuse of its discretion.

## VI. *REMAINING ISSUES*

We have carefully considered the arguments advanced in support of the appellants' other assignments of error on appeal, and in view of the record, find them to be equally without merit. For the foregoing reasons, the judgments appealed from are affirmed and the Clerk of this Court is directed to enter judgment accordingly.

## ORDER

On consideration of the petition for rehearing and suggestion for rehearing en banc filed in the above-entitled cause by the Defendants-Appellants, John Hedman, Michael Jercich, Thomas Karnick and Henry Larsen, no judge in active service has requested a vote thereon, and all of the judges on the original panel have voted to deny a rehearing. Accordingly,

IT IS ORDERED that the aforesaid petition for rehearing be, and the same is hereby, DENIED.*

* During the pendency of the petition for rehearing, defendants-appellants filed a motion to reconsider en banc the denial of the motion for remand and a supplement to that motion. The defendants-appellants' original motion to remand was denied in this Court's slip opinion of this appeal, decided August 29, 1980. At 1197, n.9. The panel has reviewed the subsequent

motion and supplement filed by defendants-appellants and has determined to deny the motion and reaffirm the original decision on this matter contained in the slip opinion, without however precluding renewed consideration of this issue in post-conviction proceedings. We note also that no judge in active service has requested a vote to reconsider this panel's denial of defendants-appellants' original motion to remand.