UNITED STATES of America,
Plaintiff-Appellee,

v.

Anthony T. MACHI,
Defendant-Appellant.

and

UNITED STATES of America,
Plaintiff-Appellee,

v.

Frank A. CALARCO,
Defendant-Appellant.

Nos. 86–1352, 86–1443.

United States Court of Appeals,
Seventh Circuit.

Argued Sept. 4, 1986.

Decided Jan. 27, 1987.

As Corrected Feb. 6, 1987.

---

Stephen M. Glynn, Shellow, Shellow & Glynn, S.C., Dennis P. Coffey, Coffey, Coffey & Geraghty, Milwaukee, Wis., for defendant-appellant.

Mel S. Johnson, Asst. U.S. Atty., Joseph P. Stadtmueller, U.S. Atty., U.S. Attorney's Office, Milwaukee, Wis., for plaintiff-appellee.

Before CUMMINGS and COFFEY, Circuit Judges and SWYGERT, Senior Circuit Judge.

COFFEY, Circuit Judge.

The defendants Anthony T. Machi and Frank A. Calarco (Attorney at Law) appeal their convictions for obstructing the due administration of justice in violation of 18 U.S.C. § 1503, and conspiracy to obstruct justice in violation of 18 U.S.C. § 371. We affirm the respective convictions and sentences of each defendant.

I

On August 14, 1985, Anthony T. Machi and Frank A. Calarco (Attorney at Law) were indicted (1) for conspiring to obstruct justice in violation of 18 U.S.C. § 371, and (2) obstructing the administration of justice in violation of 18 U.S.C. § 1503. The basis of the indictments were allegations that Machi and Calarco sought to convince a convicted drug dealer, Douglas Lane, that upon the payment of $50,000 they would have his four-year prison sentence reduced to 15 months.

Lane was convicted in the U.S. District Court for the Eastern District of Wisconsin in 1984 of selling marijuana and was sentenced to a four-year term of confinement by the Honorable Terence Evans, who allowed him to remain free on bail with a personal recognizance bond pending his appeal. While out on bail on the personal recognizance bond, Lane met with Machi in Machi's Milwaukee nightclub, "Teddy's on Farwell" in an attempt to collect the $5,000 Machi owed him on a loan of $25,000 Lane made to Machi in 1977 and 1978. During this meeting with Machi, Lane mentioned his conviction and impending sentence. Lane testified that Machi stated he could get Lane's sentence reduced but that "it probably wouldn't be cheap."

Lane met with Machi again a few days later and at this time Machi stated he could get his (Lane's) four-year sentence reduced to 15 months upon payment of $50,000. Lane testified that Machi

"said that there were people out east that he felt could help get me my sentence reduced to 15 months, which is what my co-defendants had gotten, and that it would cost me $50,000."

Lane contacted his attorney concerning this offer and thereafter met with Machi again. At this second meeting, Machi told Lane that time was of the essence and that Lane would have to act fast if he wanted his sentence reduced. Lane testified that Machi told him that "he had talked to these people and that he definitely felt confident that he could arrange for a reduction of my sentence down to 15 months" and that

Lane "should not tell anybody because I was dealing with some very heavy people, and it would not be very healthy for me to mention it to anybody." After Lane's second meeting with Machi, on the advice of his attorney he contacted and met with IRS agent Larry Kaiser and told him about Machi's proposition. The agent suggested that Lane cooperate with the government (IRS). Lane agreed to cooperate, and Kaiser arranged to have Lane's next meeting with Machi recorded. Lane was wired with a transmitter at this meeting and his conversation with Machi was recorded, including the discussion of Machi's offer to have Lane's sentence reduced for $50,000.

A short time thereafter, Lane's attorney and IRS agent Kaiser advised Lane that Judge Evans could not reduce his sentence while his appeal was pending. Lane brought this problem to Machi's attention at their fourth meeting on March 11, 1985. Lane testified that two days later on March 13, 1985, he again met with Machi who stated that "basically, they were dealing with Washington heavyweights and they had said the thing for me [Lane] to do is to go in and immediately drop my appeal and then go in for a sentence modification." [1]

Lane and Machi met again on March 21, 1985. It was during this meeting that Lane, while wired, recorded Machi's conversation telling him that his sentence reduction was all set. Lane testified that Machi told him

> "the wheels were in motion and that my [Lane] sentence would be modified to 15 months and that the Judge would be ordered to modify my sentence, but I needed to go in immediately and drop my appeal."

Lane again met Machi on March 26, and Lane testified that during this meeting Machi stated that

> "he had overheard a conversation between an associate of his and a guy named Don out east and that my 15–month sentence was all set up...."

On March 27, 1985, Machi called Lane and told Lane he would get a call from "Jay" (Calarco), Machi's co-conspirator, in about ten minutes concerning the arrangements that had been made. When "Jay" (Calarco) called Lane about ten minutes later, Lane while recording the conversation heard Jay reaffirm Machi's representations that the sentence reduction scheme was underway and that all Lane need do, was drop his appeal. It was stipulated by the parties prior to trial that the voice of the man on the phone was that of Attorney Frank Calarco, alias "Jay."

A few days later, on April 1, Lane arranged to meet Machi at Teddy's. Machi had been informed prior to Lane's arrival that Lane was wired and also that his (Machi's) phone was bugged and confronted Lane with this "bugging" information by showing Lane a note card on which Machi had written "I know you are wired and I know your phone is tapped." Lane admitted to Machi that he was wired, and at Machi's suggestion the two men passed notes to each other rather than orally discussing the sentence reduction arrangement. Shortly thereafter, on August 14, 1985, Machi and Calarco were indicted by a federal grand jury and charged with endeavoring to obstruct the administration of justice in violation of 18 U.S.C. § 1503, and conspiring to obstruct the administration of justice, 18 U.S.C. § 371.

After a five-day trial, the jury, on January 18, 1986, convicted Machi and Calarco on each of the two counts charged in the indictment. Machi and Calarco individually received five-year sentences of imprisonment on each count with the sentences ordered to be served concurrently.

## II

Machi and Calarco both contend on appeal that the government failed to establish that they had in fact intended to obstruct or impede the administration of justice but were merely scheming to defraud Lane of

---

**1.** This conversation between Machi and Lane was not recorded as part of Lane's agreement to cooperate with the IRS.

$50,000. Defendants argue that the evidence established at most, a scheme by Machi and Calarco to swindle $50,000 from Lane on the pretext that they could and would have Lane's four-year sentence for drug peddling reduced to 15 months. The defendants maintain that their plan to defraud Lane of $50,000 did not contemplate interference with the judicial process and therefore, they were not in violation of 18 U.S.C. § 1503 which requires the government to prove a specific intent to obstruct or impede the administration of justice. Machi and Calarco further argue that because the court rejected the defendants' requested instruction on specific intent and instructed the jury that

"[a] defendant who intentionally takes certain actions or tries to set up certain arrangements, the reasonably foreseeable consequence of which is to obstruct justice, acts corruptly even if he does not specifically intend the judicial process be impaired"

The instruction was improper on the element of specific intent under § 1503. The defendants maintained that the trial court improperly relieved the government of its burden of proving an essential element of the crime of obstructing justice—specific intent—and in doing so allowed the jury to convict them under § 1503 despite the fact that the government never established that the defendants' possessed the specific intent required to obstruct the administration of justice.

Turning to the defendants' initial assertion that the district court improperly instructed the jury as to the specific intent element of § 1503,

"We accept at the outset the well-established proposition that a single instruction to the jury may not be judged in artificial isolation, but must be viewed in the context of the overall charge. While this does not mean that an instruction by itself may never rise to the level of constitutional error, it does recognize that a judgment of conviction is commonly the culmination of a trial which includes testimony of witnesses, argument of counsel, receipt of exhibits in evidence, and instruction of the jury by the judge. Thus not only is the challenged instruction but one of many such instructions, but the process of instruction itself is but one of several components of the trial which may result in the judgment of conviction."

*Cupp v. Naughten*, 414 U.S. 141, 146–47, 94 S.Ct. 396, 400–01, 38 L.Ed.2d 368 (1973). This court has explained "[i]t is axiomatic that in determining the propriety of instructions, they are to be viewed as a whole.... As long as the instructions treat the issues fairly and adequately, they will not be interfered with on appeal." *United States v. Patrick*, 542 F.2d 381, 389 (7th Cir.1976). *See also United States v. Isaacs*, 493 F.2d 1124, 1163 (7th Cir.1974) ("It is elementary that the instructions must be considered as a whole and it is sufficient if they treat the issues fairly and adequately"); *United States v. O'Malley*, 796 F.2d 891, 897 (7th Cir.1986) ("The rule in this circuit is that, '[i]n determining propriety of instructions they are to be viewed as a whole and as long as the instructions treat the issues fairly and adequately they will not be interfered with on appeal.'" (quoting *United States v. Croft*, 750 F.2d 1354, 1366 (7th Cir.1984)). Thus, we refuse to read each challenged jury instruction in isolation, but rather we review all of the trial court's jury instructions and determine whether after reading the instructions in their entirety, they fairly and adequately inform the jury of the proper law to be applied to the facts of the case.

The defendants raise two issues concerning the court's instructions to the jury: (1) the trial court failed to give the specific intent instruction requested by the defendants; and (2) the trial court improperly instructed the jury that a specific intent to obstruct justice is not required for a conviction under § 1503. Although we agree with the defendants that specific intent is an element the government must prove in order to convict under § 1503, *United States v. McComb*, 744 F.2d 555 (7th Cir. 1984), we do not agree and refuse to mandate that a separate instruction on specific

intent is required. In *United States v. Bailey*, 444 U.S. 394, 403, 100 S.Ct. 624, 631, 62 L.Ed.2d 575 (1980), the Supreme Court stated:

> "At common law, crimes generally were classified as requiring either 'general intent' or 'specific intent.' This venerable distinction, however, has been a source of a good deal of confusion."

The Seventh Circuit Committee on Criminal Jury Instructions noted:

> "The Committee recommends avoiding instructions that distinguish between 'specific intent' and 'general intent.'
>
> \* \* \* \* \* \*
>
> Distinctions between 'specific' and 'general' intent more than likely confuse rather than enlighten juries."

Federal Criminal Jury Instructions of the Seventh Circuit, 6.02 (Specific Intent—General Intent). The Committee's comments make specific reference to § 1503 as an offense where the "stock 'specific' and 'general' intent instructions should be avoided in favor of instructions that precisely define the requisite mental state of the particular crime charged." Section 1503 requires the government to establish that the defendants:

> "Corruptly or by threats or force ... influenced, obstructed, or impeded, or endeavored to influence, obstruct, or impede, the due administration of justice."

In the case before us, the district court told the jury that:

> "[t]o sustain the charge of obstruction of justice, the government must prove the following provisions. First, that the defendants or defendant endeavored to influence, obstruct, or impede the due administration of justice, and second, that the defendants' acts were done knowingly and corruptively."

The district court went on to explain the necessary state of mind required to support a conviction under § 1503:

> "Corruptly means to act with the purpose of obstructing justice. The United States is not required to prove that the defendant's only or even main purpose

was to obstruct the due administration of justice, that the government has to establish that the defendants should have reasonable have [sic] seen that the natural and probably [sic] consequences of his acts was the obstruction of justice."

The district court, as suggested by the Seventh Circuit's Committee on Criminal Jury Instructions declined to give a specific intent instruction but, instead instructed the jury as to the "requisite mental state of the particular crime charged." The district court's instruction on the elements of § 1503 comports with that approved by the Seventh Circuit's Committee on Criminal Jury Instructions and is consistent with the case law addressing the mental state required to convict under § 1503. As the court stated in *United States v. Rasheed*, 663 F.2d 843, 852 (9th Cir.1981):

> "Black's Law Dictionary defines 'corruptly' to mean with 'a wrongful design to acquire some pecuniary or other advantage.' Black's Law Dictionary 414 (4th ed. rev. 1968). We hold that the word 'corruptly' as used in the statute means that the act must be done with the purpose of obstructing justice. Decisions of other circuits support this position. *United States v. Ogle*, 613 F.2d 233, 238 (10th Cir.1979), *cert. denied*, 449 U.S. 825, 101 S.Ct. 87, 66 L.Ed.2d 28 (1980); *United States v. Haas*, 583 F.2d 216, 220 (5th Cir.1978), *cert. denied*, 440 U.S. 981, 99 S.Ct. 1788, 60 L.Ed.2d 240 (1979)."

The additional instruction requested by the defendants on specific intent would not have served to clarify the instruction the district court gave on the elements of § 1503, and might very well have served to confuse the jury by suggesting that the government had to prove something other than that the defendants' acts were done corruptly. Since the district court's instruction properly informed the jury of the defendants' required state of mind under § 1503, we hold the district court did not commit error in rejecting the defendants' request for a separate specific intent instruction.

The defendants, while relying on the following language, also argue that the district court's instruction on inferring intent from conduct, improperly shifted the burden of proof concerning the state of mind required under § 1503 to the defendants:

> "A defendant who intentionally takes certain actions or tries to set up certain arrangements, the foreseeable consequence of which is to obstruct justice, acts corruptly even if he does not specifically intend the judicial process be impaired."

The defendants argue that the language in this instruction converts the offense they were charged with into a "strict liability crime" (i.e., a crime that did not require fault) since the jury was advised that the jury could convict the defendants even if the defendants did not intend to obstruct justice. We reject this distorted and self-serving interpretation of the district court's jury's instructions as converting § 1503 into a strict liability offense. The instruction quoted followed the district court's explanation of "corruptly" and merely elaborated and explained for the elucidation of the jury the "natural and probable consequences" which the district court referred to in its definition of corruptly. This court has held "[i]ntent to obstruct justice is something that a jury may infer from all the surrounding facts and circumstances." *United States v. McComb*, 744 F.2d at 561. As the Fifth Circuit explained in *Knight v. United States*, 310 F.2d 305, 307 (1962), the specific intent required to convict under § 1503 "must be to do some act or acts which tend to impede or influence, obstruct, or impede the due administration of justice." Thus "while the statutory term 'corruptly endeavors' requires intent, such intent may be inferred from proof that the defendant had knowledge or notice that his corrupt actions would obstruct justice then actually being administered." *United States v. Buffalano*, 727 F.2d 50, 54 (2nd Cir.1984).

■ The district court jury instructions were in accord with the case law interpreting § 1503. The trial court's instruction to the jury as to the "state of mind" required to convict under § 1503 was not only proper, but clear and concise and informed the jury that it could infer the required state of mind from the conduct of the defendants in soliciting money from Lane on the pretext that they could arrange to have his four-year sentence of confinement reduced to fifteen months. Although reference to specific intent in the district court's foreseeable consequences instruction might not have been necessary according to the Seventh Circuit's Committee on Criminal Jury Instructions, the jury instructions when considered in their entirety as we must, "fairly and adequately" presented the issues and the law to the jury and thus were not prejudicial to either of the defendants' cases. Therefore, we hold that a fair and proper reading of the district court's foreseeable consequences instruction does not constitute reversible error.

Both defendants challenge the sufficiency of the evidence presented. Defendants assert that the government's evidence established at best, a scheme to defraud Lane of $50,000, and that a scheme to defraud does not constitute a violation of § 1503:

> "From start to finish it was the defendants' position that his actions were of a fraudulent nature; it was intended that financial gain would be achieved without any intent to secure a modification of Mr. Lane's sentence or any present ability to do so. No evidence was adduced that either of the defendants, at any time, took any positive steps to effectuate the modification of Mr. Lane's sentence."

Essentially the defendants are arguing that their plan to swindle $50,000 from Lane in promising to get his sentence reduced, did not obstruct or impede the administration of justice because they never intended to fulfill their end of the bargain, that is, they had no intention of even attempting to accomplish the reduction of his four-year sentence. Therefore the defendants contend the government did not establish their intent to obstruct or impede the administration of justice as required under § 1503.

■ Although this court has never addressed the question of whether a scheme to defraud that interferes with a judicial proceeding constitutes a violation of § 1503 where the defendants allege there was no intent to produce the promised result, we agree with a number of other circuits who have concluded that such a scheme is in violation of § 1503. In *United States v. Neiswender*, 590 F.2d 1269 (4th Cir.1979), Neiswender contacted an attorney defending the former governor of Maryland in a criminal proceeding and claimed that for $20,000, Neiswender could insure that the trial would "come out the right way." Neiswender was indicted and charged with a violation of § 1503 in that he attempted to interfere with the outcome of a judicial proceeding by deterring the defendants from taking their cases to trial even though he claimed he never intended to interfere in the outcome of the trial. The Fourth Circuit rejected Neiswender's argument that the plan to defraud could not constitute a violation of § 1503 since the specific intent to obstruct or impede justice was absent, explaining

"None of these cases, however, has carefully considered how the specific intent requirement applies to a defendant whose hope is to avoid obstructing justice while the natural consequence of success in his endeavor would be to achieve precisely the opposite result. We see no need to undertake an extended excursion into the subtleties of the specific intent. In our view, the *defendant need only have had knowledge or notice that success in his fraud would have likely have resulted in an obstruction of justice. Notice is provided by the reasonable foreseeability of the natural and probable consequences of one's acts.*"

590 F.2d at 1273. In *United States v. Buffalano*, the defendant was convicted of soliciting money from a convicted felon for the purpose of aiding in the reduction of that convicted felon's sentence. On appeal, Buffalano made the same argument as Machi and Calarco: that he could not be convicted under § 1503 since he never intend-

ed to get the sentence reduced but rather intended only to defraud his innocent victim of $3,500. The Second Circuit rejected Buffalano's argument explaining that "while the statutory term 'corruptly endeavors' requires intent, such intent may be inferred from proof the defendant had knowledge or notice that his corrupt actions could obstruct justice then actually being administered." 727 F.2d at 54. In *United States v. Silverman*, 745 F.2d 1386 (11th Cir.1984), Silverman, an attorney, represented to four of his clients that for $25,000 he could arrange to have his clients receive a term of probation rather than imprisonment if each pleaded guilty to the offenses charged. On appeal, the defendant Silverman argued that the district court erred in refusing to give his requested instructions on the essential elements of the offense. The Eleventh Circuit rejected Silverman's argument stating:

"Silverman's proposed instruction incorrectly explained 'specific intent': it placed the burden on the government to prove that the purpose and object of Silverman's endeavor was to influence or obstruct due administration of justice. This requirement was too demanding. The government need only to show that the defendant had knowledge or notice that his conduct would have likely resulted in an obstruction of justice. Such knowledge or notice is supplied by the reasonable foreseeability of the natural and probable consequences of one's acts. One who violates section 1503 by knowingly and purposefully undertaking an act, the natural and probable consequence of which is to influence, obstruct, or impede the due administration of justice. We therefore reject Silverman's claim that the trial judge erred in charging the jury."

745 F.2d at 1396 (citations and footnotes omitted). In the case before us, the defendants collaborated in a scheme to defraud Lane of $50,000 on the pretext that they could get Lane's sentence reduced. This alone would constitute a violation of

§ 1503 under the "lulling effects" theory adopted by the court in *Buffalano:*

"Applying that rule to the facts in this case, we conclude that Buffalano's actions clearly could constitute a violation of section 1503. This solicitation was an endeavor under the statute that had the potential to lull 'innocent victims' into a false sense of security deterring him from taking an active role himself to secure a more favorable sentence. For example, as a result of being fraudulently lulled into false sense of security, a victim might fail to volunteer information to the prosecutor, supply his own counsel or his probation officer with mitigating material drawn from his own life, dispute the pre-sentence report or address the court allocution."

727 F.2d at 54. But in this case, Machi and Calarco went far beyond the *Buffalano* scenario and beyond the mere solicitation of money and went so far as to encourage Lane to drop his appeal then pending before the appellate court. Regardless of their ultimate intention, Machi and Calarco's scheme of attempting to induce Lane to withdraw his appeal would have deterred Lane, had he followed their suggestion, from actively prosecuting his appeal and receiving the review of his conviction he was entitled to receive under the law. Attorney Calarco and Machi were now well aware that the district court could not modify Lane's sentence while his case was pending before an appellate court after being informed by Lane that he (Lane) would have to withdraw his appeal before his sentence could be modified. The natural and probable consequences of the scheme of the defendant's as far as the defendants were concerned was that Lane, based on the previous advice from Kaiser to Lane to Machi, would withdraw his appeal—which by its very nature constitutes a direct interference with the administration of justice. Therefore, we hold that the government's evidence was sufficient to establish that Machi and Calarco collaborated in a scheme not only to defraud Lane but also attempted to induce Lane to withdraw his appeal of his drug conviction in furtherance of the conspiracy. The natural and probable consequences of Machi and Calarco's scheme of inducing Lane to (1) drop the appeal of his conviction and (2) pay $50,000 for a sentence modification was a direct interference with the administration of justice and thus the government's evidence was more than sufficient to support the defendants' conviction under § 1503 for endeavoring to obstruct the due administration of justice.

### III

Calarco and Machi each raised several other issues on appeal. Calarco contends that the admission of three Wisconsin Supreme Court rules concerning the ethical obligations of attorneys was erroneous under Federal Rules of Evidence 401 and 403. Calarco further contends that the government improperly vouched for the credibility of its principal witness, Doug Lane. Calarco argues that the improper testimony occurred when the district court admitted in evidence Lane's agreement to cooperate with the government in the prosecution of Calarco and Machi in return for a recommendation by the government that Lane's four-year term of imprisonment be modified to probation. Calarco also asserts that the government's reference to Lane's probation agreement during closing argument also constituted improper testimony of witness Lane's veracity in that the prosecutor's comment suggested to the jury that Lane's testimony was true.

Machi argues that the district court erred in giving a multiple purposes conspiracy instruction because the instruction allowed the jury to convict Machi on an uncharged crime. Machi further argues that the district court abused its discretion in not inquiring more thoroughly into the possibility of jury misconduct after a juror telephoned the judge at his home to complain about the inattentiveness of some of her fellow jurors. We address each of the defendant's assertion of errors.

### A. CALARCO

Attorney Calarco argues that the district court improperly admitted into evidence

three Wisconsin Supreme Court Rules governing the ethical obligations of a licensed attorney.[2] Calarco asserts that the rules were not relevant to the proceeding against him and therefore the ethical rules were inadmissible under Federal Rule of Evidence 401. Calarco argues in the alternative, that even if the ethical rules were relevant, their prejudicial effect outweighed any probative value they may have had since the jury may have believed he was guilty of the crime charged because he violated the ethical rules of his profession. Thus, Att'y Calarco asserts that the district court should not have admitted the ethical rules into evidence under Federal Rule of Evidence 403.

We may find error in the district court's evidentiary decisions only if we find that the court clearly abused its discretion in admitting the challenged evidence. *United States v. Hoffman,* 806 F.2d 703 (7th Cir. 1986). "A district court has broad authority to control the admission of evidence...." *United States v. Rovetuso,* 768 F.2d 809, 815 (7th Cir.1985). The record establishes that the government introduced the Wisconsin Supreme Court Rules to rebut Calarco's claim that he was not an active participant in Machi's scheme to defraud Lane, but rather called Lane as a "favor to a friend" (Machi), and thus had no interest in the outcome of Machi's scheme. The government argued that the ethical rules were relevant to rebut Att'y Calarco's "favor to a friend" defense since the rules raised an inference that but for a stake in the outcome of the scheme to defraud Lane, he (Calarco) would not have intentionally engaged in the type of unethical conduct that would have most assuredly jeopardized his professional (legal) career. In other words, the government argued

that the ethical rules were necessary and relevant to establish the government's position that Att'y Calarco was an active participant in the scheme to defraud Lane since Calarco would not have risked his professional (legal) career to engage in clearly unethical conduct merely as a favor to a friend.

■ Evidence from which the jury could infer that Calarco's active participation in the fraudulent shakedown including but not limited to his phone call to Lane went beyond doing a "friend a favor" was necessary and relevant to the prosecution's case against Calarco. The ethical rules the government introduced in evidence informed the jury that Calarco's conduct in conversing with Lane concerning the allegedly promised sentence reduction by Judge Evans and the need for Lane's withdrawal of his appeal were serious violations of his professional obligations as an attorney, and Att'y Calarco was well aware of the fact that he could have been disbarred for such conduct. The jury could thus reasonably have inferred from Calarco's blatant and caloused conduct in direct violation of his ethical obligations that Calarco had a financial interest in the outcome of the scheme. Att'y Calarco's actions when viewed in light of the Wisconsin Supreme Court Rules make it clear that he chose to cast aside his ethical obligations and responsibilities as an attorney and thereby risk his professional career in calling Lane to encourage Lane to accept and participate in the sentence reduction deal. The government in its brief argues that the sentence modification scheme promised that Judge Evans would reduce Lane's sentence upon Lane's payment of $50,000 to Machi, and Lane could have reasonably inferred from Calarco and Machi's statement that Judge

**2.** The three Wisconsin Supreme Court Rules provide:

SCR 20.44 Contact with officials.
(1) A lawyer may not give or lend anything of value to a judge, official or employee of a tribunal.
SCR 20.47 Statements concerning judges and other adjudicatory officials.

\*　\*　\*　\*　\*　\*

(2) A lawyer may not knowingly make false accusations against a judge or other adjudicatory official.
SCR 20.49 Avoiding even the appearance of impropriety.

\*　\*　\*　\*　\*　\*

(3) A lawyer may not state or imply that he or she is able to influence improperly or upon irrelevant grounds any tribunal, legislative body or public official.

Evans' was involved in the conspiracy and that he (Judge Evans) thus may have had an interest in the $50,000 payment. Att'y Calarco's participation in a scheme of soliciting $50,000 that involved a judge would constitute a violation of Rule 20.44 which makes it unethical for a lawyer to "give or lend anything of value to a judge, official or employee of a tribunal." Attorney Calarco, when stating to Lane that Lane would "not get any favors from that court [Evans] without this favor [$50,000]," certainly implied that Judge Evans was a participant in the scheme to some extent, thereby violating Rule 20.47 which proscribes a lawyer from making "false accusations against a judge or other adjudicatory official." Further, Machi and Calarco's scheme, by its very nature, suggested that Machi and Calarco were in a position to influence the court (Judge Evans) responsible for imposing Lane's sentence. In so doing, Att'y Calarco violated Rule 20.49 which makes it unethical for any lawyer to "state or *imply* that he or she is able to influence improperly or upon irrelevant grounds any tribunal...." The introduction of the rules of professional conduct into evidence were proper to establish the inference that Calarco had an interest in the outcome of the scheme was clearly relevant to rebut and overcome Calarco's trumped up assertion that he telephoned Lane as a "favor to a friend" at the request of Machi. Thus, the introduction of the ethical rules in evidence was proper to establish the inference that Att'y Calarco had more than a passing interest in the scheme and was not merely doing it as a "favor to a friend." We next address the issue of whether the prejudicial effect of these rules outweighed their probative value.

■ Calarco asserts that if the ethical rules were relevant, their prejudicial effect outweighed any probative value the rules had since he speculates that the jury could have mistakenly equated his violation of the ethical rules with an intent to obstruct the administration of justice and thereby convict him under § 1503 for what amounted to only a violation of the rules of profes-

sional conduct. However, Calarco's argument conveniently overlooks the precautions that the court, the prosecutor, and Calarco's own attorney took during the course of the trial to eliminate any possible prejudicial effect the introduction of the ethical rules may have had. During closing argument, the prosecutor explained the importance of the ethical rules to the government's case, but specifically and clearly cautioned the jury against inferring that Att'y Calarco had violated the federal statute § 1503 merely because he had violated ethical rules of his profession:

> "[Prosecutor] I bring up these ethical rules and will argue that Mr. Calarco's call violated these rules. But my point is certainly not to argue that Mr. Calarco is unethical; therefore, he is guilty. Violation of legal ethics is not a crime, and you should not in any way make that jump,—Mr. Calarco is unethical. Therefore, he's guilty. However, these ethical rules are an important part of the evidence regarding what I guess Mr. Calarco implied in his defense. And I want to discuss that in a few minutes."

Defense counsel reiterated the prosecutor's cautionary comment during his closing argument:

> "[Calarco's Counsel] Remember that Mr. Calarco had testimony here about the rules of the, the ethical rules of the Board of Attorneys Professional Responsibility in Wisconsin and that Mr. Johnson has said that the conduct of Mr. Calarco in making the phone call to Mr. Lane on March 27th which violates those rules, in some ways they may, his conduct may and may not, it probably does violate those rules or at least one of those rules, but you know, the State of Wisconsin has a Board of Attorneys Professional Responsibility to enforce the disciplinary rules and the ethical rules of the legal profession. This is not a case entitled Board of Attorneys Professional Responsibility v. Frank Calarco. This case is entitled *United States of America v. Frank Calarco.* Mr. Calarco is here before you not on trial for anything

other than the charge contained in the indictment in this case. It would be a violation of your sworn duty both as jurors to find him guilty because of any conduct other than that which is alleged in this indictment. And if the government doesn't prove the charges in the indictment beyond a reasonable doubt, Mr. Calarco, like it or not, is entitled to your verdict of not guilty."

Finally, the trial judge informed the jury as part of his instructions to the jury that "[t]he defendants are not on trial for any action or conduct not alleged in the indictment."

In view of the probative value of the ethical rules concerning the veracity of Att'y Calarco's claim that he was only doing a "favor for a friend" when he telephoned Lane and was not involved in the scheme to defraud Lane of $50,000, we hold that any prejudice to Calarco that may have resulted from the introduction of the Wisconsin Supreme Court Rules did not outweigh the probative value of the evidence. The ethical rules were necessary for the government to answer and explain Calarco's alleged "favor to a friend" defense. The prosecutor and the defense attorneys not only argued to the jury, but the trial court clearly explained the very limited purpose for which the Wisconsin Supreme Court Rules were introduced, and further meticulously cautioned the jury against inferring Calarco's guilt under § 1503 from any conduct on his part that might be construed as violating the ethical rules of his profession.

Accordingly, we hold that the district court's admission of the attorney's rules of ethical conduct as approved and mandated by the Wisconsin Supreme Court was proper for the purpose of rebutting Calarco's claim that he had no interest in the scheme to defraud Lane of $50,000 but was merely doing a "favor for a friend."

Calarco next argues that the prosecutor improperly vouched for its principal witness, Doug Lane, on two occasions: (1) when the prosecutor had Lane read the agreement to cooperate with the government that Lane had signed into the record and questioned Lane as to the government's appearance on Lane's behalf and the sentence modification hearing, and (2) during closing argument when the prosecution recited a portion of the agreement.

The government introduced Lane's agreement to cooperate with the government in the prosecution of Calarco and Machi and the district court permitted Lane to read the agreement into the record.[3] The prosecutor then questioned Lane as follows:

"Q. [Prosecutor] Thank you. Now, was a sentence modification filed on your behalf?

A. Yes, it was.

Q. By whom?

A. By my attorney, Tom Brown.

Q. And was a hearing held on that matter?

A. Yes, there was.

Q. Who was the judge?

---

**3.** I am writing to give us a written record of the agreement which has already been made between the United States and your client, Douglas Lane. Mr. Lane has done the following things:

1. He has actively cooperated with the government's investigation of an obstruction of justice case involving Anthony Machi and Frank Calarco and has agreed to truthfully testify in any legal proceedings which may arise in that case;

2. He has provided information relevant to an ongoing cocaine delivery investigation of Jeffrey Abbett and has agreed to truthfully testify to that information in any legal proceedings which may arise in that case; and

**3.** He has allowed himself to be debriefed on his general knowledge of various individuals suspected to be involved in drug trafficking in Wisconsin.

In return for Mr. Lane's cooperation and agreement to testify, the United States has agreed to recommend that his present four-year federal prison sentence be modified to a term of probation. The parties recognize that this modification of sentence cannot be sought until the resolution of Mr. Lane's appeal which is presently pending in the Seventh Circuit Court of Appeals.

I believe that this accurately and completely states our agreement. If you feel that I have stated anything inaccurately or incompletely, please contact me.

A. Judge Evans.

Q. At that time, what position did the United States take about your sentence modification motion?

A. They recommended probation.

Q. Has that motion been resolved yet by Judge Evans?

A. No, it hasn't.

*Mr. Johnson:* Thank you, I have no further questions, Mr. Lane."

Calarco also argues that the introduction of the agreement into evidence and Lane's testimony that the government had appeared on Lane's behalf at Lane's sentence modification hearing amounted to the government vouching for the veracity of its witness, Doug Lane. Calarco makes this argument even though his defense attorney thoroughly cross-examined Lane concerning Lane's agreement with the government attempting to suggest to the jury that Lane had an incentive to provide testimony that would assist the government in obtaining convictions of Machi and Calarco regardless of the truth or accuracy of that testimony. Calarco asserts that the agreement required Lane to testify truthfully, and therefore the evidence that the government appeared on Lane's behalf at Lane's sentence modification hearing in effect suggested to the jury the government believed the witness since the government had upheld its end of the cooperation agreement, a very clever and ingenious argument. Calarco also contends that the prosecutor improperly vouched for Lane during his closing argument in which the prosecutor stated:

"Now, here at trial again, is agreement which I read to you, which is Exhibit 8, says that part of his agreement is that he agrees to testify truthfully. If he does not, the deal is off...."

The trial court immediately sustained defense counsel's objection to this comment, explaining "[t]here was no oral testimony to that effect, and there's nothing in the exhibit [stating that the deal was off if Lane did not testify truthfully]."

▉ Evidence of a witness' agreement with the government to testify in exchange for immunity or other prosecutorial concessions is properly admissible in evidence:

"We believe that the jury's function of assessing credibility and weighing testimony is aided by evidence of an immunized witness' understanding of the terms under which he or she is testifying. Indeed, such questions by the prosecution frequently provide a convenient opening for more exploration of a fertile area on cross-examination."

*United States v. Hedman,* 630 F.2d 1184, 1198 (7th Cir.1980) (quoting *United States v. Craig,* 573 F.2d 513, 519 (7th Cir.1978)). Further, this court has stated that, "A prosecutor may neither inject his personal opinion on credibility into the proceedings nor should the jury be led to believe that the prosecutor has other information not presented at trial which leads him to believe the witness is telling the truth." *United States v. Creamer,* 555 F.2d 612, 617 (7th Cir.1977). *See also United States v. Hedman,* 630 F.2d 1184 (7th Cir.1980); *United States v. Torres,* 809 F.2d 429, 435 (7th Cir.1987). But absent an "overt statement of personal belief and [any] insinuation that the prosecutor knew better than the jury what the truth was" *Creamer,* 555 F.2d at 617, there is nothing improper in bringing to the jury's attention the fact that the government has an agreement with one of its witnesses that requires a witness to testify truthfully. As we noted in *United States v. Peters,* 791 F.2d 1270, 1300 (7th Cir.1986), "[c]onditioning performance of the agreement upon truthful testimony at trial does not encourage exaggeration or lying, but rather serves as a necessary means to insure truthful compliance with the agreement." Thus

"[M]ention of the promises did not create the appearance that the government had a greater stake in the honesty of its witnesses. Perhaps the government has a slightly greater interest in charging a witness with perjury when the witness has promised to tell the truth was the consideration for the government's promise to grant immunity—proving perjury might be a prerequisite to rescinding the

agreement—but no juror would be inclined to suppose that the difference is enough to make the government any more certain about the credibility of witnesses who make such promises."

*United States v. Kramer*, 711 F.2d 789, 795 (7th Cir.1983).

In the case before us, the record is the best evidence establishing that the prosecutor made no "overt statement of personal belief" that Lane was telling the truth nor does the record lend support to Calarco's assertion that the testimony and the prosecutor's remark during closing argument insinuated that the prosecutor "knew better than the jury what the truth was." Lane's testimony that the government had appeared on his behalf at his sentence modification hearing merely helped to place all the facts before the jury concerning the cooperation agreement and left the jury with the opportunity to view and weigh the testimony and the credibility of the witness in its deliberations as the jury determined was just and proper. Further, the trial court *sua sponte* instructed the jury to disregard the prosecutor's remarks during closing argument regarding Lane's obligation to testify truthfully or the deal was off:

> *"THE COURT:* Ladies and gentlemen of the jury, during ths morning's closing argument at one point there was a statement by Mr. Johnson regarding the consequences that would follow should Mr. Lane not testify truthfully. As the agreement that he had, written agreement that he had with the government, Exhibit 8 delineated. A statement was made by Mr. Johnson, there was objection made by Mr. Coffey, the court checked the agreement, I had a very sure memory in my own mind that there had not been any oral testimony on that regard, and I sustained the objection. I should have, I believe, at that time, immediately have said something to you, on reflection I'm going to instruct you that the objection was sustained, that statement by counsel did not have support in the record of the case, and you should disregard that particular statement. Is that clear? Strike it from your minds."

Therefore we hold that the record is clear that the government did not improperly vouch for the veracity of Lane's testimony, and any argument that the jury may have drawn an inference to the contrary is nothing but an example of fly specking the record in hopes of discovering error and is at best nothing other than self-serving speculation. Further, any inference that the government was vouching for the credibility of Lane that the jury might possibly have drawn from the prosecutor's remarks during closing argument was eliminated by the district court's meticulously clear and unambiguous instruction to the jury to disregard any such inference as to the veracity of the government's witness.

### B. MACHI

Machi argues that the district court committed a reversible error in giving a multiple purposes conspiracy instruction to the jury since the instruction allowed the jury to convict him (Machi) of a crime not charged in the indictment. The trial court instructed the jury that:

> "A singel [sic] conspiracy may have several purposes, but if one of them, whether primary or secondary be the violation of a federal law, the conspiracy is unlawful under federal law."

Machi contends that by referring to a violation of "*a* federal law," the district court suggested that the jury could convict Machi if it believed he violated any federal law, regardless of whether Machi was indicted for violating that law, an ingenious and farfetched argument at best. Such a suggestion borders on the ridiculous in this case since the defendants have argued throughout these proceedings that they only intended to defraud Lane of $50,000, but did not intend to obstruct the administration of justice as the government charged. Thus, Machi asserts that the jury could have convicted him of conspiracy pursuant to the district court's instruction if the jury believed Machi's scheme to de-

fraud Lane was a violation of federal law even though Machi was only charged with obstructing the administration of justice.

■ Machi's argument very clearly ignores the context in which the conspiracy instruction was given. The court's reference to "a federal law" must be construed in view of the court's instruction that the jury could not convict the defendants of any crime not charged in the indictment. The district court read and explained the indictment in detail to the jury and made it perfectly clear that the defendants were charged with (1) obstructing the due administration of justice and (2) conspiring to obstruct the administration of justice and not with defrauding Lane of $50,000. The court explained to the jury that if the natural and probable consequences of the plan to defraud Lane was the obstruction of justice, then the jury could convict the defendants under § 1503 and conspiracy to obstruct the administration of justice under 18 U.S.C. § 371—but only if it was satisfied beyond a reasonable doubt that the government had established each and every element of the crimes charged. Further, we do not agree with the defendant's mere speculation and legally unsupportable argument that the instruction even suggested to the jury that it could convict Machi if the jury believed Machi had violated "any" federal law. As we have noted earlier in this opinion, "[i]t is axiomatic that in determining the propriety of instructions, they are to be viewed as a whole.... As long as the instructions treat the issues fairly and adequately, they will not be interfered with on appeal." *United States v. Patrick*, 542 F.2d 381, 389 (7th Cir.1976). In the case before us, the instruction, in effect, informed the jury that it could find the defendants guilty of conspiracy to obstruct the administration of justice even if the main purpose of their efforts was to defraud Lane of $50,000, as long as the jury also concluded that in pursuit of that objective, the defendants also obstructed the administration of justice. The instruction is in full accord with the decisions of the United States Supreme Court. *See Ingram v. United States*, 360 U.S. 672, 79

S.Ct. 1314, 3 L.Ed.2d 1503 (1959) ("A conspiracy may have multiple purposes any one of which, if a violation of federal law, may constitute the basis for" a conspiracy conviction); *Anderson v. United States*, 417 U.S. 211, 94 S.Ct. 2253, 41 L.Ed.2d 20 (1974) ("A single conspiracy may have several purposes but if one of them—whether primary or secondary—would be the violation of a federal law, a conspiracy is unlawful under federal law"). Accordingly, we hold that the district court did not commit reversible error in instructing the jury in multiple purpose conspiracies.

Machi also argues that the district court abused its discretion in not conducting a more thorough inquiry into the bias or incompetence of a juror who called the judge one evening during the trial to complain about the inattentiveness of her fellow jurors. The juror called the judge at home on the evening of the third day of trial to complain that in her opinion, certain other jurors were not paying close attention to the trial because a number of jurors on the panel had discussed the clothes worn by persons who had been in the courtroom during the trial. The trial judge recounted the juror's phone call and conversation to the attention of the prosecutor and defense attorneys the next day, but no decision as to what course of action should be taken, if any, was made at this time. The second day after the phone call, the trial judge again discussed the problem of the juror's complaint with counsel for the defendants and the government in chambers after the attorneys had had an opportunity to make their own observations. All agreed that after observing the jury closely during the previous day's proceedings, the jury in fact did appear attentive and alert and that no impropriety was observable. The trial judge stated:

"I observed the jurors carefully yesterday and I must say that I don't think that they were being negligent in their attention. At least I wasn't able to see anything that looked unusual...."

Defense counsel agreed that in his opinion the jury had appeared attentive throughout

the trial, but requested an inquiry into the competency of the juror and the effect her conduct and observations might have had on the other jurors—she admitted during her phone call to the judge that she had discussed her concerns with several other jurors. In the alternative, defense counsel suggested that since the jurors did not know which of them was the alternate, the court should substitute the alternate for the complaining juror when the time came to dismiss the alternate and send the jury out for deliberation. The trial court took defense counsel's request under advisement but decided, after the close of testimony, not to take any action concerning the complaining juror. The court explained:

"Well, the actual fact, counselor, is that there was no opportunity during the day for me to get her in here without her absence being noted by the other members of the jury. Plus, I was watching the jury very carefully today, as I did yesterday, and I was unable to detect any inattention on the part of any of the other jurors. I don't know whether her feeling that there was a lack of attention was just because she had a personal feeling in that regard or whether there was some inference that she drew from the light conversation that was had in the jury room during their break.

Since none of the counsel, nor the Court, nor the bailiff, had been able to observe an overt inattention, the fact, in fact, I thought they listened very carefully the two days that I was watching them specifically, I felt that it would be improper for me to interfere in any way with the due administration of justice to put a quotation around it, in other words, the process we follow for selecting for alternates are set by the rules. We follow them with rigor, and lacking any basis upon which to take a juror out of the jury and substitute an alternate, I came to the conclusion it would probably be improper for me to do so, and that's the reason for my action."

On appeal, Machi argues that in not conducting an in depth and detailed inquiry into the competency or bias of the complaining juror, the court abused its discretion since in his opinion the juror's conduct brought her competency into question and raised questions as to the effect her conduct may have had on the other jurors' ability to deliberate impartially.

The standard of review in cases where juror misconduct is alleged is whether the district court abused its discretion in determining whether or not to conduct further inquiry into the juror's conduct. *United States v. Barrett*, 703 F.2d 1076 (9th Cir.1983). The defendant concedes in his brief that the "abuse of discretion" standard is the proper standard of review in this case. Turning to the record before us, all parties (after having had an opportunity to observe the jury in light of the previous day's complaint) admitted that the jury appeared attentive during trial. As counsel for Machi noted:

"I mean,—it's in my experience that in cases where there are a lot of tapes, alot of times jurors really get tired of it. And I don't know what Your Honor's reaction, but the afternoon that we,—I think was Wednesday afternoon when we played all the tapes back to back to back, that was a long afternoon. It was only two and a half hours of it, but it got old fast. And based upon my observations, the jurors all seemed to be paying full attention, and that seemed to me the ideal time for people to start looking around the courtroom."

Thus from the best evidence "the record" as far as all parties were concerned, and we agree from our review of the same that, the complaining juror's allegations about the inattentiveness of certain fellow jurors was without merit.

Machi also asserts that the complaining juror's conduct raised questions as to her competency that should have prompted the district court to inquire further into her competency. The learned trial judge with many years of courtroom experience both as a prosecutor and as a trial judge (eleven years) has considerable discretion in determining whether to hold a hearing on al-

leged juror misconduct. *See Barrett, supra; United States v. Jones,* 707 F.2d 1169 (10th Cir.1983). The court explained:

"Plus, I was watching the jury very carefully today, as I did yesterday, and I was unable to detect any inattention on the part of any of the other jurors. I don't know whether her feeling that there was a lack of attention was just because she had a personal feeling in that regard or whether there was some inference that she drew from the light conversation that she had heard in the jury room during their break."

The court went on to explain why it declined to substitute the alternate juror for the complaining juror when the time came to excuse the alternate:

"Since none of the counsel, nor the court, nor the bailiff, had been able to observe an overt inattention, the fact, in fact, I thought they listened very carefully the two days that I was watching them specifically, I felt that it would be improper for me to interfere in any way with the due administration of justice to put a quotation around it, in other words, the process we follow for selecting for alternates are set by the rules. We follow them with rigor, and lacking any basis upon which to take a juror out of the jury and substitute an alternate, I came to the conclusion it would probably be improper for me to do so, and that's the reason for my action."

Thus, the record makes clear that the trial court carefully considered the alleged competency (potential misconduct) of the complaining juror and the possible remedies available to cure any misconduct and incompetency and concluded that since the evidence did not establish any misconduct, there was no need to take the severe measure of substituting the alternate juror for the complaining juror that counsel had suggested in order to cure a problem that could only be classified as speculative at best. Therefore, we hold that the district court did not abuse its discretion in declining to inquire into the complaining juror's competency and rejecting counsel's

suggestion that the alternate juror be substituted for the complaining juror.

Machi's final argument is that the complaining juror may have improperly influenced the other jurors. Machi fails to point out one scintilla of evidence in the record that might lend credence to such an argument, but instead speculates that the jurors were improperly discussing the evidence prior to their deliberations. According to the record, the complaining juror never stated that she or any of the other jurors were discussing the evidence before the trial had concluded. The only discussion among the jurors she mentioned in her call to the judge was the discussion of clothing worn by people in the courtroom and her discussion of the suspected inattentiveness of her fellow jurors and that she discussed her concern with several other jurors. Certainly, a concerned juror such as the complaining juror in this case could very well and probably would have called the judge's attention at the time of her phone call to any impropriety in discussing the evidence that she was aware of especially after the trial court had instructed the jury at the beginning of the trial that:

"... Until this case is submitted to you, you should not discuss it with anyone, even your fellow jurors...."

But the complaining juror limited her complaint to the comments of other jurors discussing the clothing of persons in the courtroom. Thus, Machi's argument that the complaining juror's comments raise an inference that the jurors were improperly discussing the evidence prior to deliberations is unfounded and nothing but speculation and without support in the record. Accordingly, we hold that the district court did not abuse its discretion in refusing to substitute the alternate juror for the complaining juror and in declining to conduct an inquiry into potential juror misconduct.

IV

The convictions and the sentences of the defendants for obstructing the administration of justice and conspiring to obstruct the administration of justice are affirmed.